67 So.2d 825

**Ex parte RICE et al.**

**5 Div. 562.**

Supreme Court of Alabama.

Oct. 29, 1953.

'J. A. Walker, Jacob Walker, Jr., and
Walker & Walker, Opelika, for petitioner.

572

Denson & Denson and Yetta G. Samford, Jr., Opelika, for respondent.

PER CURIAM.

We have here the same question of law as we had in Ex parte Rice, 258 Ala. 132, 61 So.2d 7, and between the same parties. It appears that after the petition was denied in that proceeding petitioner amended his answer and then sought to have interrogatories answered, such as were submitted before.

Reference is made to the case of Rice v. Sinclair Refining Co., 256 Ala. 565, 56 So.2d 647, as well as to Ex parte Rice, supra, for the situation as it now appears in connection with the amended answer.

So that the question now, as then, is whether the answer presents a valid defense to the equity of the bill for specific performance. The answer seeks to invoke as a defense, as before, that complainant Sinclair Refining Company had the intent, in making the contract and now in enforcing it, to use the property to accomplish an unlawful purpose. Bement & Sons v. National Harrow Co., 186 U.S. 70, 22 S.Ct. 747, 46 L.Ed. 1058. The purpose was to engage in a monopoly in violation of the state and federal law. The monopoly is alleged to have two aspects as set up in the answer as originally filed and as amended. The first aspect is that the intent to acquire a monopoly relates to the nation-wide character of its business of producing, refining and distributing gasoline and other petroleum products; and to acquire the property here involved, which is a filling station,

was 'to add another station to those which it operated throughout the land and was a step in perfecting a virtual petroleum monopoly; and that the acquisition of this property was with the intent to control this retail outlet and restrain a competitor from using it; that "complainant was a large corporation nationally engaged in the leasing of real estate for use in distribution of its gasoline and other oil products; it was a large owner and lessee of oil lands" and "a nation wide distributor of gasoline by pipelines, rail and ship in interstate commerce, * * * and a wholesale and retail dealer throughout the United States and particularly in Alabama"; and supplied its products to service stations known as leased out stations, dealer stations and otherwise.

We cannot see that the allegations as to this aspect are equal in legal effect to those stated in United States v. Richfield Oil Corp., D.C., 99 F.Supp. 280. That case was affirmed by the United States Supreme Court on the authority of Standard Oil Co. of Cal. and Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371, to which reference will be made later in this opinion.

We assume that this aspect of the answer undertakes to charge complainant with monopolizing the petroleum industry throughout the nation, or contracting so as to tend to such monopoly in violation of the Sherman Act of Congress, Title 15 U.S.C.A. §§ 1, 2 and 3. This Act prohibits a contract in restraint of trade. The answer has not been amended in respect to that claim. Apparently that aspect of the answer is not that the contract tends to a monopoly or to restrain trade in the Auburn, Alabama territory, but throughout the nation, and that the Auburn unit, here involved, was a part of that broad scheme.

In Ex parte Rice, supra, we noted that to be a good defense in that respect the use made of the property as alleged must have been directly, and not merely incidentally, influential in effecting a monopoly; and that the answer shows that the use made of this property is only incidental to such alleged monopoly or as a restraint of trade. It must be more than collateral to that re-

sult. Such principle was also said to be applied cautiously. It might also be added that one small such station could scarcely substantially lessen competition or create a monopoly on a nation-wide or even state-wide basis. In fact, it is not alleged that it so tends in the territory of Auburn. *Non constat,* all the large and small refiners are in full competition with Sinclair in that territory. It is not shown that the performance of the contract here in question is material in that respect.

The second theory or aspect of the answer would invalidate the contract of purchase on account of alleged monopolistic arrangements between Sinclair and its tenants in the use of the property. The tenants do not complain, but this respondent is saying that because of complainant's monopolistic status with its tenants, he will not carry out his agreement with Sinclair. He says Sinclair's purpose and use of the property is contrary to the public policy of the United States as expressed in the Clayton Act, Title 15 U.S.C.A. § 14, and for that reason the contract, otherwise enforceable, should not be performed by the court. The amended answer deals with that status. It alleges that the first lease of the station was completed in 1936. Sinclair leased it to one Jolly by tenancy at will on condition *express or implied* that he was limited to the sale at said station of Sinclair gasoline, oil, grease, tires, batteries, and like accessories, and had instructions to that effect, and by that means Sinclair restrained trade and exercised a monopoly of goods of that sort. In 1937 Jolly sold his effects at the station to Blackburn who became a subtenant of Sinclair; and that he was limited at said station to the sale of Sinclair products and of Goodyear tires, batteries and accessories which Sinclair had agreed to handle. This limitation was by instructions to him from Sinclair or its agents. In 1938 Blackburn delivered possession of the station to McMillan who operated it as a subtenant until 1941 when he died. In 1941 Shine entered into possession as subtenant of complainant and was so occupying it at the expiration of the lease from Rice to Sinclair. That each of said subtenants was limited by

complainant to the sale of Sinclair products, and the station is so used at the present time.

The answer is that by this means, complainant restrained and is still restraining trade and exercised and is still exercising a monopoly in the use of its property. That the operators of the station have been unable to buy competitive products for resale at that station; that other refiners have secured like arrangements for their products at Auburn and have limited their operators in the same manner. Thereby the public is limited in its ability to handle products of independent dealers. That respondents did not know of this until shortly before the filing of this suit. That the conditions named have been directly influential in effecting a monopoly or restraint of trade. The details thus expressed were not set out in the original answer.

Reliance is had, as it was before, on the case of Standard Oil Co. of Cal. and Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051, 1053, 93 L.Ed. 1371. That is a suit by the United States against Standard Oil Company for a declaratory judgment that its exclusive supply contracts with independent dealers in petroleum products are illegal, and sought and obtained an injunction. Standard sold gas at retail at its own stations and to independent service stations and to industrial users in California and other western states. "In 1946 its combined sales amounted to 23% of the total taxable gallonage sold there in that year: sales by company-owned service stations constituted 6.8% of the total, sales under exclusive dealing contracts with independent service stations, 6.7% of the total"; the remainder to industrial users. The retail sales by its six leading competitors absorbed 42.5% of the total taxable gallonage. "The remaining retail sales were divided between more than seventy small companies. * * * Standard's major competitors employ similar exclusive dealing arrangements." There were in issue in that case about 8,000 exclusive supply contracts made by Standard. "Two types, covering 2,777 outlets, bind the dealer to purchase of Standard all his requirements of gasoline and other petroleum products as well as tires, tubes, and batteries. The remaining written agreements, 4,368 in number, bind the dealer to purchase of Standard all his requirements of petroleum products only." There were 742 independent dealers who had oral contracts by which they agreed to sell only Standard products.

In that case it was pointed out that section 3 of the Clayton Act, Title 15 U.S.C.A. § 14, prohibits the sale of commodities for resale within the United States *"on the condition, agreement, or understanding* that the lessee or purchaser thereof shall not use or deal in the goods" of a competitor of the seller "where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to *substantially lessen competition or tend to create a monopoly in any line of commerce."* The question to be determined was "whether the requirement of showing that the effect of the agreements 'may be to substantially lessen competition' may be met simply by proof that a substantial portion of commerce is affected or whether it must also be demonstrated that competitive activity has actually diminished or probably will diminish." That it "was not intended to reach every remote lessening of competition is shown in the requirement that such lessening must be *substantial."* The facts and figures were given in detail, and cases analyzed, leading to the following conclusion: "That the qualifying clause of section 3 (Title 15 U.S.C.A. § 14) is satisfied by proof that competition has been foreclosed in a substantial share of the line of commerce affected * * * and it is clear that the affected proportion of retail sales of petroleum products is substantial." (Italics supplied.)

The Standard Oil Company case, supra [337 U.S. 293, 69 S.Ct. 1057], analyzed Federal Trade Commission v. Sinclair Refining Co., 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746, a suit by the Federal Trade Commission to require Sinclair to abandon certain properties, and it was stated that it "involved the lease of gasoline pumps and storage tanks on condition that the dealer would use them only for Sinclair's gas-

oline, but Sinclair did not own patents on the pumps or tanks and evidently did not otherwise control their supply. Although the Trade Commission had found that few dealers needed more than one pump, the Court concluded that 'the record does not show that the probable effect of the practice will be unduly to lessen competition.' * * * The basis of this conclusion was thus summarized: 'Many competitors seek to sell excellent brands of gasoline and no one of them is essential to the retail business. The lessee is free to buy wherever he chooses; he may freely accept and use as many pumps as he wishes and may discontinue any or all of them. He may carry on business as his judgment dictates and his means permit, save only that he cannot use the lessor's equipment for dispensing another's brand. By investing a comparatively small sum, he can buy an outfit and use it without hindrance. He can have respondent's gasoline, with the pump or without the pump, and many competitors seeks to supply his needs.' " The Standard case then continues after that quotation, by observing that: "The present case differs of course in the fact that a dealer who has entered a requirements contract with Standard cannot consistently with that contract sell the petroleum products of a competitor of Standard's no matter how many pumps he has, but the case is significant for the importance it attaches, in the absence of a showing that the *supplier dominated the market, to the practical effect of the contracts.*" (Italics supplied.)

█ The answer here in question does not show that the contract involved meets the requirements of the Clayton Act, referred to above, so as to be an infringement of it by showing that its effect was to *lessen competition to a substantial extent.*

We do not seem to have in Alabama a statute which defines an unlawful monopoly. Section 108, Title 57, Code, makes it a crime, punishable by fine, for any person, including a corporation, to restrain trade or create a monopoly. Section 103 of the Constitution requires legislation to prohibit monopolies and combinations. Section 78, Title 57, Code, makes lawful certain con-

tracts fixing a minimum resale price. We have applied the common law, which is substantially as set out in the Sherman and Clayton Acts. See Sherrill v. Alabama Appliance Co., 240 Ala. 46 (7), 197 So. 1.

The federal statutes, Sherman and Clayton Acts, prescribe the terms of unlawful monopolies and restraints of trade as they should also be administered in Alabama. The question, therefore, is properly affected by those acts, and it must be controlled by them when the business involved in the suit affects interstate commerce. It is upon that basis that the foregoing conclusions prevail in this case.

█ It is insisted that Sinclair is immune from the benefits of the self-incriminating feature of the Fifth Amendment and the search and seizure clause of Amendment Four of the Federal Constitution because it is a corporation. Those immunities apply only to federal procedure. Hunt v. State, 248 Ala. 217, 27 So.2d 186. The right of one to claim the privilege was taken away by an act of Congress in respect to antitrust laws. This Act immunizes a person from prosecution on account of any transaction about which he may testify as to such matter in any proceeding under certain named statutes. Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652. Compare, Baush Machine Tool Co. v. Aluminum Co. of America, 2 Cir., 63 F.2d 778.

█ The instant suit is not a proceeding under those statutes. This being a proceeding in a state court, not under those statutes, the question is controlled by the State Constitution, section 6, and laws. There is nothing in Alabama law to prevent the operation of this privilege. *"Person"* includes a corporation under the equal protection and due process clause of the Federal Constitution. Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660. Section 108, Title 57, Code, makes a corporation guilty of a crime in respect to antitrust laws. It was held in the Hale case, supra, that a corporation charged with violating the antitrust law of the United States is entitled to immunity, under the Fourth Amendment to the Feder-

al Constitution relating to searches and seizures, from such an unreasonable search and seizure as the compulsory production under a subpoena duces tecum of all undertakings, contracts or correspondence between such corporation and other companies (six in number). We repeat what we said in Ex parte Rice, 258 Ala. 132, 61 So.2d 7, that the interrogatories seek to put upon Sinclair an improper burden, especially in the light of the fact that it serves as self-incriminating under section 6 of the Alabama Constitution. Morris v. McClellan, 154 Ala. 639 (10), 45 So. 641.

The petition for mandamus should be denied.

The foregoing opinion was prepared by Foster, Supernumerary Justice of this Court, while serving on it at the request of the Chief Justice under authority of Title 13, § 32, Code, and was adopted by the Court as its opinion.

Mandamus denied.

LIVINGSTON, C. J., and SIMPSON, GOODWYN and CLAYTON, JJ., concur.