STUART, Justice.
On August 11, 2010, students and former students (hereinafter referred to as “the students”) of the University of Alabama (“UA”), Auburn University (“Auburn”), and the University of Alabama at Birmingham (“UAB”) (hereinafter referred to collectively as “the universities”) filed three separate class-action lawsuits in the Jefferson Circuit Court challenging the legality of so-called “dining-dollars” programs implemented by the universities and pursuant to which all undergraduate students are required to pay a mandatory dining fee each semester, which is then credited back to the students in the form of “dining dollars” that could be spent only at on-campus dining outlets controlled exclusively by the food-service vendors for the universities — Aramark Educational Services, Inc., at UA; Compass Group, USA, Inc., d/b/a/ Chartwells at Auburn; and Sodexo, Inc., at UAB (hereinafter referred to collectively as “the food-service vendors”). On December 29, 2010, the trial court dismissed the three actions, and the students now appeal. We have consolidated the three appeals for the purpose of writing one opinion. We affirm.
I.
In 1992, UA hired the Cornyn Fasano Group (“CFG”), a food-service-management consulting firm, to study the dining services available at UA and to make recommendations on how to better administer those services. CFG submitted its final report to UA in July 1995, and among the recommendations made in that report were the recommendations that UA implement a mandatory dining fee for all full-time undergraduate students and that UA contract with a third-party company to administer all food services on the UA Tuscaloosa campus.
Approximately a month after receiving the CFG report, UA issued a notice requesting proposals from vendors interested in operating its on-campus food services. Aramark submitted a proposal in October 1995 and, in June 1996, entered into a contract with UA to operate all food services on the UA Tuscaloosa campus, including vending machines, traditional dining halls for students living on campus, and other restaurant and café outlets. Pursuant to the terms of the contract, Aramark made an initial payment to UA to help finance the renovation of campus dining facilities and also agreed to pay UA an annual commission on all on-campus food sales with a minimum annual guaranteed return. In turn, UA agreed to provide Aramark use of all on-campus dining facilities and to complete renovations of certain facilities. UA also agreed to impose a mandatory dining fee upon all full-time undergraduate students in the amount of $200 per semester, which would be credited back to the students as dining dollars.[1] Students could then access the dining dollars in their accounts by swiping their student ID cards as payment at the Ara-mark outlets on campus.[2] At the conclusion of the academic year, students with *330 unspent dining dollars could request a refund of those remaining funds.
In subsequent years, UAB and Auburn each decided to revamp their on-campus food services in a similar fashion. In June 2005, UAB entered into a contract with Sodexo that was substantially similar to the contract UA had entered into with Aramark — Sodexo provided funds for the renovation and/or construction of on-campus dining facilities and agreed to pay UAB a commission on all food sold by Sodexo while UAB granted Sodexo exclusive control of all food services at UAB. UAB also implemented a dining-dollars program pursuant to which each full-time undergraduate student was charged a mandatory dining fee of $225 each semester, then credited back an equal amount of dining dollars to be used exclusively at Sodexo outlets on campus.
Auburn thereafter implemented its own dining-dollars program beginning with the freshman class entering in the fall semester of 2008.[3] In July 2007, Auburn entered into a contract with Chartwells, pursuant to which Chartwells was made the exclusive provider of food services at Auburn in return for paying Auburn a commission on all food-service sales and helping to fund capital improvements to on-campus dining facilities. Auburn agreed to begin imposing a mandatory dining fee of $995 per semester upon all students living on campus and $800 per semester upon those students living off campus.[4] An amount equal to that fee was then placed in a dining-dollars account linked to each student’s ID card, and the student could then spend those funds at Chartwells food outlets on campus. Unlike students at UA, students at Auburn and UAB cannot apply for a refund of the unused dining dollars in their accounts at the end of the academic year, and the programs at Auburn and UAB have not been expanded to include any off-campus dining establishments.
On August 11, 2010, groups of students and former students at UA, UAB, and Auburn who had paid the mandatory dining fee at their respective universities filed three separate actions in the Jefferson Circuit Court. The students named as defendants in those actions the boards of trustees governing the universities and certain university administrators, as well as the food-service vendors (hereinafter referred to collectively as “the defendants”).[5] The students specifically alleged that the universities’ exclusive contracts with their respective food-service vendors violated § 6-5-60, Ala.Code 1975, inasmuch as those contracts created “an unlawful trust, combine, or monopoly” and that those contracts were unconstitutional in that they violated the prohibition in Ala. Const.1901, Art. IV, § 93, against the State’s “be[ing] interested in any private or corporate en *331 terprise.” The students suing UA and Auburn — but not the students suing UAB — also alleged that UA and Auburn had violated § 16-l-32(d), Ala.Code 1975, because the student ID cards at those universities were effectively acting as university-issued debit cards and the transaction fees associated with their use were accordingly prohibited by law from exceeding five percent, yet, when the commissions due under the food-services contracts were included, those fees were more than three times that statutory limit. Finally, the students also alleged that the universities and food-service vendors had unlawfully converted their funds and transformed them from lawful currency into dining dollars. The students sought class certification for their claims, a judgment declaring the universities’ contracts with the food-service vendors to be illegal, and both injunctive relief and money damages.[6]
Along with the complaints, the students also served interrogatories, requests for production, and requests for admissions upon the defendants. The defendants thereafter moved to stay discovery and for an extension of time in which to file motions to dismiss, and, on September 24, 2010, the trial court granted those motions, ordering that all motions to dismiss be filed by October 1, 2010. On that date, the defendants filed motions to dismiss the complaints for failure to state a claim upon which relief could be granted, pursuant to Rule 12(b)(6), Ala. R. Civ. P., and, on December 29, 2010, after conducting a consolidated hearing, the trial court granted the defendants’ motions and dismissed all pending claims with prejudice. On February 9, 2011, the students filed these appeals.
II.
We explained the standard of review applicable to an appeal of a trial court’s judgment dismissing a case pursuant to Rule 12(b)(6) as follows in Crosslin v. Health Care Authority of Huntsville, 5 So.3d 1193, 1195 (Ala.2008):
“In considering whether a complaint is sufficient to withstand a motion to dismiss under Rule 12(b)(6), Ala. R. Civ. P., a court ‘must accept the allegations of the complaint as true.’ Creola Land Dev., Inc. v. Bentbroolce Housing, L.L.C., 828 So.2d 285, 288 (Ala.2002) (emphasis omitted). ‘“The appropriate standard of review under Rule 12(b)(6)[, Ala. R. Civ. P.,] is whether, when the allegations of the complaint are viewed most strongly in the pleader’s favor, it appears that the pleader could prove any set of circumstances that would entitle [it] to relief.” ’ Smith v. National Sec. Ins. Co., 860 So.2d 343, 345 (Ala.2003) (quoting Nance v. Matthews, 622 So.2d 297, 299 (Ala.1993)). In determining whether this is true, a court considers only whether the plaintiff may possibly prevail, not whether the plaintiff will ultimately prevail. Id. Put another way, ‘ “a Rule 12(b)(6) dismissal is proper only when it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief.” ’ Id. (emphasis added).”
III.
The students argue that the trial court erred in dismissing: (1) their antitrust claims; (2) their § 93 unlawful-state-interest-in-a-private-enterprise constitu *332 tional claims; (3) their § 16 — 1—32(d) excessive-transaction-fee claims; and (4) their conversion claims. We will consider each group of claims in that order; however, inasmuch as the students have named certain public entities and officials — the boards of trustees and administrators of the universities — as defendants, we first must consider the applicability of Ala. Const.1901, Art. I, § 14, which provides generally that “the State of Alabama shall never be made a defendant in any court of law or equity.”
This Court has held that the immunity afforded the State by § 14 applies to instrumentalities of the State and State officers sued in their official capacities when such an action is effectively an action against the State. Lyons v. River Road Constr., Inc., 858 So.2d 257, 261 (Ala.2003). We have specifically “extended the restriction on suits against the State found in § 14 ‘to the state’s institutions of higher learning’ and ha[ve] held those institutions absolutely immune from suit as agencies of the State.” Ex parte Troy Univ., 961 So.2d 105, 109 (Ala.2006) (quoting Taylor v. Troy State Univ., 437 So.2d 472, 474 (Ala.1983)). This § 14 bar also prohibits “actions against officers, trustees, and employees of state universities in their official capacities.” Alabama Agrie. & Meek Univ. v. Jones, 895 So.2d 867, 873 (Ala.2004). We have, however, stated that certain causes of action are not barred by § 14:
“ ‘ “There are four general categories of actions which in Aland v. Graham, 287 Ala. 226, 250 So.2d 677 (1971), we stated do not come within the prohibition of § 14: (1) actions brought to compel State officials to perform their legal duties; (2) actions brought to enjoin State officials from enforcing an unconstitutional law; (3) actions to compel State officials to perform ministerial acts; and (4) actions brought under the Declaratory Judgments Act ... seeking construction of a statute and its application in a given situation. 287 Ala. at 229-230, 250 So.2d 677. Other actions which are not prohibited by § 14 are: (5) valid inverse condemnation actions brought against State officials in their representative capacity; and (6) actions for injunction or damages brought against State officials in their representative capacity and individually where it was alleged that they had acted fraudulently, in bad faith, beyond their authority or in a mistaken interpretation of law. Wallace v. Board of Education of Montgomery County, 280 Ala. [635] at 639, 197 So.2d 428 [ (1967) ]; Unzicker v. State, 346 So.2d 931, 933 (Ala.1977); Engelhardt v. Jenkins, 273 Ala. 352, 141 So.2d 193 (1962).” ’
“Drummond Co. v. Alabama Dep’t of Transp., 937 So.2d 56, 58 (Ala.2006) (quoting [Ex parte ] Carter, 395 So.2d [65,] 68 [ (Ala.1980) ]) (emphasis omitted). These actions are sometimes referred to as ‘exceptions’ to § 14; however, in actuality these actions are simply not considered to be actions ‘ “against the State” for § 14 purposes.’ Patterson v. Gladwin Corp., 835 So.2d 137, 142 (Ala.2002). This Court has qualified those ‘exceptions,’ noting that ‘ “[a]n action is one against the [S]tate when a favorable result for the plaintiff would directly affect a contract or property right of the State, or would result in the plaintiffs recovery of money from the [S]tate.” ’ Alabama Agric. & Mech. Univ. v. Jones, 895 So.2d 867, 873 (Ala.2004) (quoting Shoals Cmty. Coll. v. Colagross, 674 So.2d 1311, 1314 (Ala.Civ.App.1995)) (emphasis added in Jones ).”
*333 Alabama Dep’t of Transp. v. Harbert Int’l, Inc., 990 So.2d 881, 840 (Ala.2008). As clarified in Harbert, these “exceptions,” including the exception for actions seeking a declaratory judgment under the Declaratory Judgments Act, apply only to actions against State officials, not actions against State agencies. Id. at 841. The defendant boards of trustees are corporate bodies governing the universities, and there is no exception to the immunity afforded the State by § 14 that would permit the trial court to entertain an action against them, regardless of whether monetary, injunc-tive, or declaratory relief is being sought. Accordingly, the boards of trustees are due to be dismissed as parties with regard to all the claims alleged by the students, and we need only consider those claims as they relate to the university administrators and the food-service vendors.[7]
The students’ first claim is that the dining-dollars programs violate § 6-5-60, which states, in relevant part:
“(a) Any person, firm, or corporation injured or damaged by an unlawful trust, combine or monopoly, or its effect, direct or indirect, may, in each instance of such injury or damage, recover the sum of $500 and all actual damages from any person, firm, or corporation creating, operating, aiding, or abetting such trust, combine, or monopoly and may commence the action therefor against any one or more of the parties to the trust, combine, or monopoly, or their attorneys, officers, or agents, who aid or abet such trust, combine, or monopoly.”
The trial court granted the defendants’ motions to dismiss the students’ § 6-5-60 antitrust claims on the basis of the state-action-immunity doctrine, a tenet of antitrust law that holds states and their in-strumentalities immune from antitrust violations if their alleged anticompetitive behavior was in accordance with a clearly articulated and affirmatively expressed policy of the State. Mobile Cnty. Water, Sewer & Fire Prot. Auth., Inc. v. Mobile Area Water & Sewer Sys., Inc., 567 F.Supp.2d 1342, 1349 (S.D.Ala.2008). On appeal, the students argue (1) that the state-action-immunity doctrine is not applicable to their antitrust claims because those claims are made under state, not federal, law, and (2) that the application of the state-action-immunity doctrine is inappropriate in this case even if it does apply to state antitrust claims. For the reasons that follow, we reject both arguments.
It is well settled that “[t]he federal law relating to monopolization governs Alabama antitrust actions.” McCluney v. Zap Prof'l Photography, Inc., 663 So.2d 922, 926 (Ala.1995) (citing Ex parte Rice, 259 Ala. 570, 67 So.2d 825 (1953)). The state-action-immunity doctrine has been a part of that federal antitrust law since 1943 when it was first articulated by the Supreme Court of the United States in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The United States Supreme Court summarized Parker and the origin of the state-action-immunity doctrine as follows in Community Communications Co. v. City of Boulder, 455 U.S. 40, 48^49, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982):
“[Parker ] addressed the question whether the federal antitrust laws prohibited a State, in the exercise of its sovereign powers, from imposing certain anticompetitive restraints. These took the form of a ‘marketing program’ adopted by the State of California for *334 the 1940 raisin crop; that program prevented appellee from freely marketing his crop in interstate commerce. Parker noted that California’s program ‘derived its authority ... from the legislative command of the state,’ id., at 350, and went on to hold that the program was therefore exempt, by virtue of the Sherman Act’s own limitations, from antitrust attack:
“ ‘We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state’s control over its officers and agents is not lightly to be attributed to Congress.’ Id., at 350-351.”
Notwithstanding the fact that this Court has previously cited Parker and applied state-action-immunity principles to a state antitrust claim in Twine v. Liberty National Life Insurance Co., 294 Ala. 43, 47, 311 So.2d 299, 302 (1975), the students argue that the state-action-immunity doctrine should not apply to state antitrust claims because, they say, the doctrine was formulated to address federalism and state-sovereignty concerns, and there can be no such concerns when it is alleged that only state, as opposed to federal, antitrust laws have been violated. Applying the state-action-immunity doctrine in such cases, the students argue, would be illogical, effectively “giving a state agency ‘state immunity’ from limitations directed specifically to the state.” (Students’ brief in case no. 1100557, p. 38.)
However, this argument fails to recognize that the limitations implicit in § 6-5-60 are not directed specifically to the State; rather, they are directed to “any person, firm, or corporation creating, operating, aiding, or abetting such [a] trust, combine, or monopoly.” (Emphasis added.) Indeed, while federalism and state-sovereignty principles may have been the primary impetus behind the formulation of the state-action-immunity doctrine, they are not the only basis for the doctrine. It is also evident from Parker that the doctrine was derived from the plain language of the Sherman Act:
“The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state. The Act is applicable to ‘persons’ including corporations, § 7, 15 U.S.C.A., and it authorizes suits under it by persons and corporations. § 15. A state may maintain a suit for damages under it, State of Georgia v. Evans, 316 U.S. 159 [ (1942) ], but the United States may not, United States v. Cooper Corp., 312 U.S. 600 [ (1941) ]—conclusions derived not from the literal meaning of the words ‘person’ and ‘corporation’ but from the purpose, the subject matter, the context and the legislative history of the statute.
“There is no suggestion of a purpose to restrain state action in the Act’s legislative history. The sponsor of the bill which was ultimately enacted as the Sherman Act declared that it prevented only ‘business combinations’. 21 Cong. Rec. 2562, 2457; see also at 2459, 2461. That its purpose was to suppress combinations to restrain competition and attempts to monopolize by individuals and corporations, abundantly appears from its legislative history. See Apex Hosiery Co. v. Leader, 310 U.S. 469, 492, 493 and note 15 [ (1940) ]; United States *335 v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271 [ (1898) ], affirmed 175 U.S. 211 [ (1899) ]; Standard Oil Co. v. United States, 221 U.S. 1, 54-58 [ (1911) ].”
317 U.S. at 351. Like the Sherman Act, there is nothing in the text of § 6-5-60 that would indicate that the Alabama Legislature intended to restrain state actors by way of § 6-5-60. Nor have the students identified anything in the relevant legislative history that would indicate as much. In fact, if anything, the language in § 6-5-60 allowing for recovery only from a “person, firm, or corporation” would seem to indicate the contrary.
The state-action-immunity doctrine also has a logical basis that is as relevant to state antitrust claims as it is to federal antitrust claims. The United States District Court for the Western District of Louisiana summarized the logical basis for granting states and their instrumentalities immunity from liability for violating state antitrust laws as follows in Airline Car Rental, Inc. v. Shreveport Airport Authority, 667 F.Supp. 303, 308 (W.D.La.1987):
“The principles of federalism and state sovereignty on which the Supreme Court relied in Parker [v. Broum, 317 U.S. 341 (1943),] have no bearing on the question whether state antitrust laws should apply to municipalities acting pursuant to a clearly expressed state policy permitting anticompetitive conduct; however, it would be illogical to hold that a state legislature which had clearly articulated such a policy nevertheless intended that a municipality acting pursuant to that policy should be subject to liability under state antitrust laws. For this reason, the court will dismiss both [the appellant’s] federal and state antitrust claims.”
For all these reasons, we now reaffirm Twine, which applied the state-action-immunity doctrine without clearly denominating it as such and explicitly hold that the state-action-immunity doctrine may be raised as a defense to claims that state antitrust laws have been violated. The university administrators are accordingly entitled to immunity with regard to the students’ § 6-5-60 antitrust claims. We further note that this is consistent with our long-standing caselaw applying federal antitrust principles to state-law antitrust claims. See Ex parte Rice, 259 Ala. 570, 575, 67 So.2d 825, 829 (1953) (noting that “[w]e do not seem to have in Alabama a statute which defines an unlawful monopoly” and accordingly holding that the federal statutes “prescribe the terms of unlawful monopolies and restraints of trade as they should also be administered in Alabama”), and Parker, 317 U.S. at 350-51 (“We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature.” (emphasis added)). However, further inquiry is necessary to determine if the food-service vendors may also claim the protections of the state-action-immunity doctrine.
In California Retail Liquor Dealers Ass’n v. Midcal Aluminum, Inc., 445 U.S. 97, 105, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) {“Midcal”), the Supreme Court of the United States unanimously held that a private party acting in conjunction with the state might be entitled to state-action-immunity protection if the private party is acting pursuant to a clearly articulated and affirmatively expressed state policy. In discussing whether the defendants acted pursuant to a clearly articulated and affirmatively expressed state policy, the trial court, in its orders dismissing the cases challenging the dining-dollars programs at UA and UAB, stated:
*336 “Applying such law here, the court begins with the legal basis for [UA’s and UAB’s] operations. Section 264 of the Alabama constitution declares that the University of Alabama system ‘shall be under the management and control of a board of trustees.’ [Section 16-47-2, Ala.Code 1975,] provides that the board of trustees ‘shall have all the rights, powers and franchises necessary to or promotive of the end of its creation and shall be charged with all the corresponding duties, liabilities and responsibilities.’ Further, from [§ 16-47-34, Ala. Code 1975], comes the additional power ‘to organize the university by appointing a corps of instructors, who shall be styled the faculty of the university, and such other officers as the interest of the university may require; to remove such instructors or officers, and to fix their salaries or compensation, and increase or reduce the same at their discretion; to institute, regulate, alter or modify the government of the university, as it may deem advisable; to prescribe courses of instruction, rates of tuition and price of board and regulate the necessary expenses of students; and to confer such degrees as are usually conferred by similar institutions.’ (Emphasis added.)
“The board of trustees for the University of Alabama system has been given, both from the constitution and from the Alabama legislature, broad authority to operate and manage [its universities’] operations. It is foreseeable that, in the exercise of such authority, the board would contract food services to third-party entities possessing expertise in that area. That such is foreseeable is evidenced by [§ 41-16-27(g), Ala.Code 1975], which generally exempts from the mandatory bid process ‘contractual services and purchases of personal property regarding the athletic department, food services, and transit services negotiated on behalf of two-year and four-year colleges and universities.... ’
“The court agrees with the defendants that the prerequisite of a clearly articulated policy does not mean that the alleged anti-competitive agreement must be specifically blessed by the legislature for the state-action immunity to apply. The U.S. Supreme Court has before made clear that a clear articulation does not require the state to declare explicitly that it expects anticompetitive conduct to result from legislation; instead, a clear articulation merely requires that anticompetitive conduct is the foreseeable result of the legislation. See Town of Hallie [v. City of Eau Claire ], 471 U.S. [34,] 41-43, 105 S.Ct. [1713,] 1718 (1985); see also F.T.C. v. Hospital Board of Directors of Lee County, 38 F.3d 1184, 1189-91 (11th Cir.1994).
“It is certainly foreseeable that a university would require some form of a mandated meal plan for its students, and it is foreseeable that an exclusive management contract would govern the provision of meal service on campus. Given the broad authority of [the board of trustees for the University of Alabama system] to govern all aspects of campus life, including the terms, conditions and fees for board provided to students, the clear articulation requirement for state-action immunity is met.”[8]
*337 The students challenge the trial court’s conclusion that the requirement that there be a clear articulation of a state policy was met, arguing that it is too great a leap to conclude that it was foreseeable that the boards of trustees of the universities would enter into the exclusive contractual relationships with the food-service vendors merely because they were granted broad authority to operate and to manage the operations of the universities. We disagree. As detailed in trial court’s order, the legislature has granted to the boards of trustees broad authority to manage the operations of their universities, and that authority certainly encompasses the authority to enter into contracts. That the statutes do not explicitly state that the boards may enter into “exclusive” contracts is irrelevant — as one court has noted, “an exclusive contract is merely a subset of the power to contract.” Active Disposal, Inc. v. City of Darien, 635 F.3d 883, 886 (7th Cir.2011). Moreover, the legislature has also specifically empowered the boards of trustees governing UA, UAB, and Auburn to control the “expenses” and “fees” payable by students at those universities, §§ 16-47-34 and 16-48-4, Ala.Code 1975. Accordingly, we agree with the trial court’s determination that it is “foreseeable that a university would require some form of a mandated meal plan for its students, and it is foreseeable that an exclusive management contract would govern the provision of meal service on campus.”[9] We also hold that all other elements of the dining-dollars programs implemented by the universities are equally foreseeable in light of the broad authority granted the boards of trustees in these areas.[10]
The students also argue that it was inappropriate for the trial court to decide issues of foreseeability and immunity at this stage of the proceedings. Citing Thetford v. City of Clanton, 605 So.2d 835, 841 (Ala.1992) (“Foreseeability is an issue for the jury to resolve.”), and Doe v. McRae’s of Alabama, 703 So.2d 348, 350 (Ala.Civ.App.1996) (“Ordinarily, foreseeability is a question of fact for the jury.”), the students argue that foreseeability is an intrin *338 sically factual issue that a jury, not a trial court considering a motion to dismiss, should resolve. The defendants, however, argue that other courts applying the state-action-immunity doctrine routinely resolve foreseeability concerns on motions to dismiss. See, e.g., Town of Hattie v. City of Eau Claire, 471 U.S. 34, 38, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985); Active Disposal, 635 F.3d at 889; Rectrix Aerodrome Ctrs. v. Barnstable Mun. Airport Comm’n, 610 F.3d 8, 16 (1st Cir.2010); and Pennsylvania v. Susquehanna Area Reg’l Awyort Auth, 423 F.Supp.2d 472, 484 (M.D.Pa.2006).
We agree with the defendants that the trial court properly decided this issue. Unlike both Thetford and McRae’s, where the issue was whether a business should be held liable for the allegedly foreseeable criminal acts of a third party, the issue here is whether the universities’ actions in implementing the dining-dollars programs were foreseeable based on the power vested in the boards of trustees by the Alabama constitution and Alabama statutes.[11] By necessity, this inquiry focused on the review and interpretation of the relevant constitutional provisions and statutes, a task traditionally reserved for the court. Federal courts applying the state-action-immunity doctrine typically resolve these issues without resort to a jury, and we find no error in the trial court’s doing the same in this case.
The students also argue that the trial court erred by deciding the immunity issue at this time, quoting Patton v. Black, 646 So.2d 8, 10 (Ala.1994): “[I]t is a rare case involving the defense of immunity that would be properly disposed of by dismissal pursuant to Rule 12(b)(6)” (as quoted in the students’ brief in case no. 1100557, p. 49). However, this quotation omits the word “discretionary” from the language of the Patton Court’s actual opinion, which reads “[tjhus, it is the rare case involving the defense of discretionary immunity that would be properly disposed of by a dismissal pursuant to Rule 12(b)(6).” (Emphasis added.) The Court elsewhere in Patton discussed the difficulties associated with the application of the discretionary-immunity defense, stating that “[t]he distinction between discretionary functions and ministerial functions is often cloudy and difficult to discern.” 646 So.2d at 10. That difficulty eventually led this Court to restate the principle of discretionary immunity in Ex parte Cranman, 792 So.2d 392 (Ala.2000).[12] Discretionary immunity is not an issue in this case, and, because the defendants have properly raised and argued the state-action-immunity defense in their motions to dismiss, the trial court’s consideration of that defense was consistent with the judicial policy that immunity issues should be decided as early as possible once raised. See, e.g., Siegert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (“One of the purposes of immunity, absolute or qualified, is to spare a defendant not only unwarranted liability, but unwarranted demands cus *339 tomarily imposed upon those defending a long drawn out lawsuit.”).
The students’ final argument with regard to whether the dining-dollars programs are the foreseeable result of a clearly articulated state policy is that they cannot be, if only because there is a more clearly articulated state policy that, they argue, forbids such programs. That policy, the students argue, is set forth in § 93 of the Alabama Constitution of 1901, which states in relevant part that “[t]he state shall not ... be interested in any private or corporate enterprise.” The students argue that the dining-dollars programs violate § 93 inasmuch as the contracts between the universities and the food-service vendors provide that the universities receive a percentage of each transaction in which dining dollars are used. Thus, the students argue, the universities are effectively business partners with the food-service vendors, in violation of the prohibition of such arrangements in § 93. See Knight v. West Alabama Envtl. Improvement Auth., 287 Ala. 15, 20, 246 So.2d 903, 906 (1971) (“The restraints of said Section 93 concerning being interested in any private or corporate enterprise have been construed to mean, with certain exceptions not here relevant, that the State may not engage, alone or in concert with others, in the business of any type generally characterized as private enterprise.”).
The trial court rejected this argument on the basis of caselaw clearly indicating that § 93 does not apply to public corporations. See, e.g., Thomas v. Alabama Mun. Elec. Auth., 432 So.2d 470, 481 (Ala.1983) (“A public corporation is a separate entity from the State and from any local political subdivision thereof. The prohibitions of Sections 93 and 94 are directed to the State and not to public corporations.”); and Knight, 287 Ala. at 19, 246 So.2d at 905 (“It is well established by the decisions of this Court that a public corporation is a separate entity from the State and from any local political subdivision thereof, including a city or county, and that the prohibitions of Section 93 are directed to the State and not to public corporations.”). The board of trustees governing UA and UAB was organized as a public corporation by § 16-47-1, Ala.Code 1975, and the board of trustees governing Auburn was similarly organized as a public corporation by § 16^18-1, Ala.Code 1975; thus, Thomas and Knight would seem applicable. However, the students argue that it is inconsistent to consider the boards of trustees as the State for immunity purposes and then in the same case declare that they are not the State for § 93 purposes; if the boards are the “State” for one purpose, the students argue, they must be the “State” for other purposes. However, while it may seem inconsistent, the trial court correctly decided these issues, because that is the result our caselaw dictates.
As referenced above, our caselaw is unanimous in its treatment of § 93 and public corporations— § 93 does not apply to them. See, e.g., Thomas and Knight, supra. The immunity that comes from § 14 and that is associated with being part of the State, however, does not automatically attach to all public corporations; some public corporations are entitled to it while others are not. In Armory Commission of Alabama v. Staudt, 388 So.2d 991, 993 (Ala.1980), we explained what more is required before a public corporation may claim that immunity, stating:
“Whether a lawsuit against a body created by legislative enactment is a suit against the state depends on the character of power delegated to the body, the relation of the body to the state, and the nature of the function performed by the body. All factors in the relationship *340 must be examined to determine whether the suit is against an arm of the state or merely against a franchisee licensed for some beneficial purpose.”
We have previously considered whether state universities, as public corporations, should be entitled to that state immunity and answered that inquiry in the affirmative. See, e.g., Rigby v. Auburn Univ., 448 So.2d 345, 347 (Ala.1984) (“[W]e conclude that because of the character of the power delegated to it by the state, its relation to the state as an institution of higher learning, and the nature of the function it performs as an institution of higher learning, Auburn University is an instrumentality of the state and therefore immune to suit by the terms of Section 14 of our state constitution.”). For those same reasons, we conclude that the boards of trustees may be considered the State for purposes of § 14 state immunity, while nevertheless maintaining a status distinct from the State for § 93 purposes because they are organized as public corporations. The trial court correctly held that the dining-dollars programs are the foreseeable result of a clearly articulated state policy.
However, although the clear-articulation-of-a-state-policy test has been met, the Midcal test applied by courts when determining whether to extend state-action immunity to nonstate parties also typically requires a showing that the alleged anti-competitive conduct is actively supervised by the state. 445 U.S. at 105. However, beginning with Town of Hallie, this requirement has been relaxed when the particular circumstances of the case make it unnecessary. 471 U.S. at 46-47 (holding that municipalities need not satisfy the second prong of the Midcal test). Relying on the rationale of Zimomra v. Alamo Rent-A-Car, Inc., 111 F.3d 1495 (10th Cir.1997), the trial court found that these were such cases because the universities had the exclusive authority both to mandate the mandatory dining fees and to set the amount of those fees, and the food-service vendors merely acted to fulfill the terms of their contracts. See Zimomra, 111 F.3d at 1499-1500 (holding that active supervision by the state need not be shown in a case challenging the legality of mandatory fees attached to car rentals because the city and the county — not a private party— had the ultimate responsibility of setting those mandatory fees). The students argue that the rationale of Zimomra should not apply because the food-service vendors played an active part in the negotiations that led to the implementation of the mandatory dining fees and the dining-dollars programs, and because the food-service vendors exercise substantial autonomy in the manner in which they provide food services under the contracts. We ultimately decline to address this issue, however, because, by any standard, it is clear that the universities actively supervised the challenged dining-dollars programs on their respective campuses.
Each of the universities’ contracts with the respective food-service vendor contains detailed provisions setting forth guidelines governing nearly every facet of the food-service vendor’s on-campus operation, including menu selection and food preparation. The universities also retain ultimate authority over food prices and the operating hours of the on-campus dining outlets. The contracts are sufficiently comprehensive that there can be no question that the universities are actively involved in and supervising the food-service operations on their campuses. Moreover, lest there be any doubt that the contracts merely allow for the possibility of supervision as opposed to actual supervision, see FTC v. Ticor Title Ins. Co., 504 U.S. 621, 638, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992) (“The mere potential for state supervision is not *341 an adequate substitute for a decision by the State.”), we also note that the contracts require the food-service vendors to file regular reports with the universities detailing their operations. For example, UA’s contract with Aramark requires Aramark to “[s]ubmit quarterly reports to the university addressing issues that affect the efficiency of the operations, security, services, food, sanitation, and any other relevant topics, and including back-up data and recommendations for improving the situation.” UA’s decision to raise the mandatory dining fee from its original $200 per semester to $300 per semester is further evidence that it is actively involved in and supervising its dining-dollars program, as opposed to merely deciding to implement such a program and then leaving the details of operation to Aramark.
The defendants have established that the food-service vendors were acting according to a clearly articulated state policy and that their actions were actively supervised by the universities; accordingly, they are protected by the state-action-immunity doctrine with regard to the students’ antitrust claims, and the trial court did not err by dismissing those claims. As explained supra, the students’ § 93 claims are also without merit because § 93 does not apply to public corporations like the boards of trustees; the trial court therefore correctly dismissed those claims as well. We thus turn to the UA and Auburn students’ argument that the trial court erred by dismissing their claims, alleging a violation of § 16 — 1—32(d).
Section 16-1-32 provides, in relevant part, as follows:
“(a) The board of trustees or any other governing body of a public institution of higher education as defined in Section 16-5-1 may establish a program which provides students enrolled at the institution with debit cards issued by the institution. This specific authority shall exist in addition to any pre-exist-ing authority to establish such a program conferred elsewhere by the Constitution of Alabama of 1901, or statute.
“(b) A student issued a debit card under the program may use the card to purchase merchandise or services available through the institution or at the institution through a person authorized to sell merchandise or services at the institution, or at any other location or through any other person as determined by the board of trustees or the governing body.
“(c) Without limiting the generality of the foregoing subsection, the debit card program shall at a minimum allow a person who operates an off-campus college bookstore which sells merchandise or services of the same kind as the merchandise or services that a student may purchase at a bookstore operated on the campus of the institution under subsection (b), to participate in the program under the same or equivalent terms applicable to a person authorized to sell merchandise or services under subsection (b), and to accept a debit card payment from a student to whom a debit card has been issued under the program for purchase of that merchandise or service.
“(d) A per transaction fee, not to exceed 3.25 percent of the total purchase price may be charged the off-campus bookstore by the institution administering the debit card program. Other merchants may participate in the program under the terms and conditions established by the institution. The transaction fee for all other merchants or vendors, irrespective of type of business, shall not exceed five percent of the total purchase price.”
*342 In their complaints, the UA and Auburn students argue that UA and Auburn have been charging transaction fees in excess of the five-percent cap in subsection (d) because the commission charged on every dining-dollars transaction exceeds five percent even before other debit-card fees are considered. The defendants argue that there has been no violation of § 16-1-32 because the commission is not properly considered a “transaction fee” for purposes of the statute. The trial court ultimately declined to reach that issue, stating:
“Finally, while the plaintiffs attempt to assert a claim under [§ 16-1-32], there is no indication that the Alabama legislature intended to create a private cause of action for any violation of that statute. A private right of action cannot be presumed; rather, ‘[o]ne claiming a private right of action within a statutory scheme must show clear evidence of a legislative intent to impose civil liability for a violation of the statute.’ Blockbuster, Inc. v. White, 819 So.2d 43, 44 (Ala.2001); American Auto. Ins. Co. v. McDonald, 812 So.2d 309, 311 (Ala.2001). Accordingly, no claim can be based on [§ 16-1-32].”
Citing Corpus Juris Secundum, the students argue that the trial court erred because, they argue, the general rule is that when a statute imposes a duty for the benefit or protection of particular individuals or classes of individuals, a violation of that duty gives a right of action to any person for whose benefit or protection the statute was enacted. 1A C.J.S. Actions § 57. However, by its very terms, this rule would grant a right of action only to those individuals for whose benefit the statute was enacted. The plain language of § 16-1-32 indicates that it was enacted to open the market for university-issued debit cards to off-campus merchants and to prevent such merchants from being charged excessive transaction fees. Thus, § 16-1-32 was enacted for the benefit of merchants, not students. Although it is possible that excessive transaction fees, if allowed, would be passed on from merchants to students (and the public in general) in the form of higher across-the-board prices, there is no indication that the legislature intended to address that indirect possibility in § 16-1-32. Because § 16-1-32 was not enacted for the direct benefit of students, we will not read into it the creation of a cause of action available to the students at UA and Auburn. The trial court’s dismissal of the § 16-1-32 claims is accordingly affirmed.
The students’ final argument is that the trial court erred by dismissing their conversion claims. The trial court does not specifically discuss these claims in its orders; however, they were implicitly included in the final paragraph of the orders, which stated: “[h]aving considered the defendants’ contentions, and the plaintiffs’ responses thereto, the court concludes that the plaintiffs may not maintain any of the causes of action asserted in their complaint.” (Emphasis added.) The defendants argue that the reason the trial court did not address the students’ conversion claims is because, the defendants argue, the students are asserting them for the first time on appeal. Upon review, however, each of the complaints filed by the students at the different universities does contain a broad allegation of conversion. See, e.g., brief of the students in case no. 1100557 (“This scheme also constitutes a conversion of the plaintiffs’ funds by requiring the payment into the dining dollars account, then transforming lawful currency into ‘dining dollars’ over which [the food-service vendor] exercises exclusive dominion and control.”). Nevertheless, the trial court’s dismissal of the students’ conversions claims is due to be affirmed because, even when the allegations of the students’ *343 complaints are viewed most strongly in their favor, it is apparent that they cannot prevail on these claims.
“To establish conversion, one must present proof of a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another’s property, or a wrongful detention or interference with another’s property.” Crown Life Ins. Co. v. Smith, 657 So.2d 821, 823 (Ala.1994). The complaints do not support a finding that any party took or otherwise illegally assumed ownership of the students’ funds. There is no allegation that any party wrongfully accessed deposit accounts belonging to the students and withdrew the money or that any party otherwise took the funds from the students without the students’ consent. Nor is there an allegation that the funds were obtained through fraud, artifice, stealth, or trickery. See Brown v. Campbell, 536 So.2d 920, 921 (Ala.1988) (holding that possession obtained through fraud, artifice, stealth, or trickery without the consent of the owner is wrongful and will support an action for conversion). Rather, the only conclusion that can be gleaned from the complaints is that the students were presented with a lawful mandatory charge associated with attendance at their chosen university and that they subsequently consented to pay that charge as a condition of attendance. Undoubtedly, some of the students did not like paying the mandatory dining fee and would have preferred to attend their respective university without paying it; however, the same is no doubt as true of any tuition payments. Such dissatisfaction, however, is not tantamount to a lack of consent. Because the students clearly consented to pay the mandatory dining fee, their conversion claims fail. See also Jones v. DCH Health Care Auth., 621 So.2d 1322, 1324 (Ala.1993) (“ ‘In order to constitute conversion, nonconsent to the possession and the disposition of the property by defendant is indispensable.’ ” (quoting 89 C.J.S. Trover & Conversion § 5, p. 535 (1955))).
IV.
The students sued the boards of trustees governing the universities, the administrators of the universities, and the food-service vendors, alleging that the dining-dollars programs operated by the universities violated: (1) state antitrust laws; (2) § 93 of the Alabama Constitution inasmuch as it forbids the State from having an interest in a private enterprise; (3) the rule in § 16 — 1—32(d) barring universities from charging excessive transaction fees to merchants that accept university-issued debit cards; and (4) the common-law prohibition on conversion. However, because the boards of trustees are entitled to state immunity pursuant to § 14 of the Alabama Constitution, all claims against them were properly dismissed. The university administrators and food-service vendors are entitled to immunity on the asserted antitrust claims as well, albeit state-action immunity as opposed to state immunity; thus, the trial court’s dismissal of the antitrust claims was also proper. Moreover, because the universities are public corporations not subject to § 93, because the students lack standing to pursue a cause of action for a violation of § 16 — 1—32(d), and because the students have not and cannot allege the necessary elements of a conversion claim, the trial court also properly dismissed the students’ other claims. Accordingly, the judgments of the trial court are hereby affirmed.
1100557 — AFFIRMED.
1100560 — AFFIRMED.
1100561 — AFFIRMED.
WOODALL, BOLIN, PARKER, MAIN, and WISE, JJ., concur.
*344 SHAW, J., concurs in the result.
MALONE, C.J., recuses himself.

. The fee was later raised to $300 per semester.

. The dining-dollars program at UA was eventually modified to allow students to spend their dining dollars at approximately four off-campus dining establishments.

. It appears that Auburn, unlike UA and UAB, may not officially use the term "dining dollars” in association with its mandatory dining fee; however, for convenience, and because of the similarities between the dining programs administered by the universities, that term is used in this opinion to refer to Auburn’s dining program as well.

. Students enrolled in classes prior to the fall 2008 semester are exempt from paying the mandatory dining fee.

.The universities are controlled by two boards of trustees. The board of trustees for the University of Alabama system controls both UA and UAB; Auburn has a separate board of trustees. The university administrators named as defendants by the students, all sued solely in their official capacities, were: (1) C. Ray Hayes, vice chancellor for financial affairs for the University of Alabama system; (2) Sarah B. Newton, then president pro tem-pore of the Auburn board of trustees; and (3) Dr. Donald L. Large, executive vice president and chief financial officer at Auburn.

. The students sought money damages only from the food-services vendors, presumably because this Court has held that "to the extent that [an] action seeks money damages from the State, it is barred by the doctrine of sovereign immunity.” Ex parte Murphy, 72 So.3d 1202, 1208 (Ala.2011).

. However, although the students may seek injunctive and declaratory relief against the university administrators, § 14 still immunizes those State officials from any claim for money damages. Harbert, 990 So.2d at 839-41.

. The order entered in the case dismissing the complaint challenging Auburn’s dining-dollars program was virtually identical; however, the paragraph describing the legal basis for Auburn’s operations read as follows:
"Applying such law here, the court begins with the legal basis for Auburn's operations. Section 266 of the Alabama constitution declares that ‘Auburn University shall be under the management and control of a board of trustees.' [Section 16-48-2, Ala. *337 Code 1975,] provides that the Auburn board of trustees 'shall have all the rights, privileges and franchises necessary to a promotion of the end of its creation and shall be charged with all corresponding duties, liabilities and responsibilities.’ Further, from [§ 16-48-4, Ala.Code 1975,] comes the additional power ‘to organize the institute by appointing a corps of instructors, who shall be styled the faculty of the university and such other instructors and officers as the interest of the university may require; and to remove any such instructors or other officers, and to fix their salaries or compensation, and increase or reduce the same at its discretion, to regulate, alter, or modify the government of the university, as it may deem advisable; to prescribe courses of instruction, rates of tuition and fees; to confer such academic and honorary degrees as are usually conferred by institutions of similar character; and to do whatever else it may deem best for promoting the interest of the university.' (Emphasis added.)”

. We also note that the CFG report submitted to UA in 1995 indicates that "mandatory board plans” were required at earlier periods in UA’s history and that on-campus dining services had been contractor-operated since 1965.

. The students object to the trial court’s use of § 41 — 16—27(g), Ala.Code 1975 — which exempts certain contracts, including those for food services, negotiated on behalf of universities from the State’s mandatory-bid requirements — to bolster its finding of foreseeability because that statute was not enacted until 2000, 6 years after the implementation of the first dining-dollars program at UA and around 100 years after the enactment of the first incarnation of § 6-5-60. However, § 41-16-27(g) does not grant universities the authority to execute contracts for food services; rather, by exempting those specific contracts from the mandatory-bid process, it implicitly recognizes that that authority exists.

. We also note that this Court overruled McRae’s in Ex parte McRae’s of Alabama, Inc., 703 So.2d 351, 352 (Ala.1997), effectively agreeing with the trial court's determination that the criminal acts of the third party were not foreseeable as a matter of law, stating: "[sjuffice it to say that there had never been a similar assault on the defendant’s store premises, or any violent crimes of any nature on those premises.”

. "Since Cranman, we analyze immunity issues in terms of 'State-agent' immunity, rather than ‘under the dichotomy of ministerial versus discretionary functions.’ Ex parte Hudson, 866 So.2d 1115, 1117 (Ala.2003).” Howard v. City of Atmore, 887 So.2d 201, 203 (Ala.2003). The analysis in Cranman, a plurality opinion, was adopted by this Court in Ex parte Butts, 775 So.2d 173 (Ala.2000).