On Application for Rehearing

MURDOCK, Justice.
This medical-malpractice. case is before us on rehearing. This Court previously *399 issued an opinion (1) vacating the judgment of the Montgomery Circuit Court in favor of Kay E. Davis, as executrix of the estate of Lauree Durden Ellison, deceased, and against the Health Care Authority for Baptist Health, an affiliate of UAB Health System (“the Authority”), and (2) dismissing the Authority’s appeal and the case on the ground that the Authority was entitled to State immunity under § 14, Ala. Const. 1901. Davis filed an application for rehearing. We withdraw the January 14, 2011, opinion, and substitute the following opinion.
7. Background Facts and Procedural History
On September 3, 2005, Lauree Durden Ellison ■ visited the emergency room of Baptist Medical Center East (hereinafter “BMCE”), a hospital operated by the Authority and formerly operated by Baptist Health, a private nonprofit corporation. Ellison’s visit was for an evaluation after she had fallen at home. At the time of the visit, Ellison was 73 years old, and she suffered from a number of chronic preexisting medical conditions, including respiratory problems, diabetes, hypertension, chronic pain, gastrointestinal bleed, and stroke-related problems.
The initial examination of Ellison did not indicate that she had an infection, and all other tests and X-rays were unremarkable for injuries caused by the fall. While she was in the emergency room, however, Ellison mentioned that she had a sore throat. The emergency-room doctor ordered a test for streptococcus. Thereafter, Ellison was discharged from the emergency room to return home.
After Ellison was discharged, the BMCE laboratory grew the culture taken from the streptococcus test. The culture reflected the presence of methicillin-resis-tant staphylococcus aureus (hereinafter “MRSA”). Although the BMCE laboratory recorded the results in its electronic medical-records system, the results were not reported directly to Ellison’s treating physician.
Over the next two months, Ellison received medical treatment for other medical conditions from providers other than BMCE. She did not complain of a sore throat during that period. On November 3, 2005, however, she returned to BMCE’s emergency room complaining of a cough and moderate to severe respiratory distress. Ellison died on November 8, 2005.
On May 25, 2006, Davis, as executrix of Ellison’s estate, filed a complaint in the trial court, naming as defendants the Authority and two physicians at BMCE.[1] Before trial, the Authority asserted that any damages awarded against it were subject to the $100,000 statutory cap on damages set out in § 11-93-2, Ala.Code 1975, which it argued was applicable to the Authority pursuant to § 22-21-318(a)(2) of the Health Care Authorities Act of 1982, Ala.Code 1975, § 22-21-310 et seq. (“the HCA Act”).
At trial, Davis presented the testimony of expert witnesses who opined that BMCE had breached the applicable standard of care by not reporting its finding of MRSA directly to Ellison’s attending physician. Davis’s expert witnesses opined that Ellison died from MRSA-related pneumonia and that the failure of the BMCE laboratory to report the finding of MRSA to Ellison’s doctor caused her death. Conversely; the Authority offered *400 the testimony of several expert witnesses who testified that MRSA does not cause a sore throat; that, because Ellison was not suffering from a throat infection when the streptococcus culture was taken, the standard of care did not require that anyone be notified of the presence of MRSA, which is present in a large part of the population without symptoms or consequences; that notifying Ellison’s doctor of the finding of MRSA would not have changed Ellison’s course of treatment; and that Ellison died of congestive heart failure unrelated to the MRSA, and not of MRSA-related pneumonia.
The jury returned a verdict in favor of Davis and against the Authority in the amount of $3,200,000, and the trial court entered a judgment for Davis in that amount. The Authority filed a post-judgment motion seeking, in part, a remit-titur of the judgment from $3,200,000 to $100,000 based on the statutory cap for damages set forth in § 11-93-2. On September 29, 2009, the trial court entered an order denying the Authority’s post-judgment motion.
The Authority appealed. On appeal, it argues that it possesses State immunity, also known as sovereign immunity, pursuant to § 14, Ala. Const.1901, which provides “[t]hat the State of Alabama shall never be made a defendant in any court of law or equity.” Also, the Authority argues that the trial court erred by not remitting the $3,200,000 damages award to $100,000 pursuant to § 11-93-2. In response, Davis contends that the Authority does not qualify for State immunity and, further, does not qualify for the protection of the $100,000 damages cap in § 11-93-2.

II. Discussion

As noted above, Baptist Health at one time operated certain hospitals in Montgomery, including BMCE. When Baptist Health encountered financial problems in conjunction with the operation of those hospitals, it sought the assistance of the University of Alabama Board of Trustees (“the Board”).[2] In June 2005, the Board adopted a resolution authorizing the formation of the Authority:
“WHEREAS, The Board of Trustees of The University of Alabama (‘the Board’) owns University of Alabama Hospital and related health care facilities located in Birmingham, Alabama (‘Hospital’); and
“WHEREAS, the Hospital is managed by the UAB Health System (‘UABHS’), pursuant to an Amended and Restated Joint Operating Agreement dated effective January 1, 2003 (‘JOA’); and
[[Image here]]
“WHEREAS, after careful consideration, UABHS and Baptist [Health] desire to affiliate for the purpose of improving the overall efficiency of Baptist [Health’s] clinical operations and for arranging for Baptist [Health] financial support of the Board’s academic and research mission through contributions to UABHS; and
“WHEREAS, by separate resolution on this same date, The Board of Trustees of The University of Alabama approved an Affiliation Agreement between the UA Board, UABHS and Baptist [Health]; and
“WHEREAS, the Affiliation Agreement provides for the establishment of a health care authority by the UA Board,' under the terms and conditions set forth in the Affiliation Agreement; ...
[[Image here]]
*401 “NOW, THEREFORE, BE IT RESOLVED that The Board of Trustees of The University of Alabama hereby declares that it is wise, expedient, and necessary that a health care authority be formed.”
After explaining that the purpose of the Authority is “to own and operate one or more hospitals and a health care delivery system,” the certificate of incorporation states:
“Pursuant to an Affiliation Agreement dated July 1, 2005 (the ‘Affiliation Agreement’) by and among the ... Board, Baptist Health, ... and UAB Health System, an Alabama nonprofit corporation (‘UABHS’), Baptist Health will transfer its hospitals and related assets to the Authority. The Authority shall have full governance powers with respect to its business and affairs, subject to the provisions of the Affiliation Agreement, including without limitation the provisions related to ‘Restricted Transactions’ contained in the Affiliation Agreement. The Affiliation Agreement, including any amendments made to such Agreement from time to time in accordance with the terms thereof, are hereby incorporated by reference in this certificate of incorporation.”
(Emphasis added.) The certificate of incorporation also states:
“Subject to the provisions of the Affiliation Agreement, the Authority shall have and may exercise all of the powers and authorities set out in the Enabling Law [i.e., the HCA Act], for corporations organized thereunder, together with such additional powers, rights, and prerogatives as are now or may hereafter be provided by law. In addition thereto, the Authority shall have the extraordinary powers set out in Section 22-21-319 of the Enabling Law (eminent domain).”
(Emphasis added.) The certificate further states:
“Subject to the Authority’s obligations under the Affiliation Agreement with respect to reconveyance of assets upon termination of the Affiliation Agreement, upon dissolution of the Authority, the title to all of the assets and property of the Authority at the time of such dissolution shall be transferred to the ... Board.”
(Emphasis added.)
The certificate of incorporation provides for an 11-member board of directors. Six directors (and their respective successors) are chosen by the Board; five directors (and their respective successors) are chosen by Baptist Health. In this respect, the certificate complies with § 22-21-316(a), Ala.Code 1975, which states that “no fewer than a majority of the directors shall be elected by the governing body or bodies of one or more of the authorizing subdivisions.” Neither the certificate of incorporation for the Authority nor the HCA Act requires that a director who is chosen by the Board have any other relationship with the Board.
In July 2005, the Board, the University of Alabama at Birmingham Health System, an Alabama nonprofit corporation (“UABHS”), and Baptist Health entered into the aforementioned affiliation agreement (“the affiliation agreement”). The affiliation agreement states:
“A. The ... Board owns University of Alabama Hospital in Birmingham, Alabama, an operating division of the University of Alabama at Birmingham, and various other entities and assets engaged in the delivery of healthcare services. University of Alabama Health Services Foundation, P.C., an Alabama nonprofit corporation (‘UAHSF’), owns the Kirklin Clinic in Birmingham, Alabama and various other entities and as *402 sets engaged in the delivery of healthcare services. UAHSF and the ... Board have established UABHS to provide common management of their respective health care delivery operations.
“B. Baptist Health owns and operates a health care delivery system (the ‘Baptist Healthcare System’) in the Montgomery, Alabama area that includes three acute care hospitals (the ‘Baptist System Hospitals’).
“C. The [HCA Act] permits the ... Board to organize a health care authority. Health care authorities are public corporations with authority to operate hospital and health care delivery systems. Pursuant to this Agreement ... [the] Board will organize a health care authority that will own and operate the Baptist Health System assets during the term of this agreement. .
“D. The parties have determined that the consummation of the transactions contemplated by this Agreement will further their mutual goals of (i) providing community-based health care in the Montgomery area, (ii) promoting efficiency and quality in the delivery of health care services to the people of the State of Alabama, and (iii) supporting the academic and research mission of [the Board and UABHS] with respect to health care services and the science of medicine.”
(Emphasis added.)

A. State Immunity

The Authority is a public corporation. It is an entity separate from the State and from the persons and entities who participated in its creation. See Alabama Hosp. Ass’n v. Dillard, 388 So.2d 903, 905 (Ala.1980) (“We simply hold, as we have so often, ‘that a public corporation is a separate entity from the state and from any local political subdivision, including a city or county within which it is organized.’” (citation omitted)).
Nonetheless, the Authority argues that it is immune from liability pursuant to the doctrine of State immunity. Although the Authority raises this argument for the first time on appeal, “[t]he assertion of State immunity challenges the subject-matter jurisdiction of the court; therefore, it may be raised at any time by the parties or by a court ex mero motu.” Atkinson v. State, 986 So.2d 408, 411 (Ala.2007); see also Ex parte Alabama Dep’t of Transp., 978 So.2d 17, 21 (Ala.2007). Because this argument, if correct, would preclude our deciding the merits of this appeal, we address this issue first.
Section 14 of the Alabama Constitution of 1901 states that “[t]he State of Alabama shall never be made a defendant in any court of law or equity.” It is well established that “ ‘the use of the word “State” in Section U was intended to protect from suit only immediate and strictly governmental agencies of the State.”’ Tallaseehatchie Creek Watershed Conservancy Dist. v. Allred, 620 So.2d 628, 631 (Ala.1993) (quoting Thomas v. Alabama Mun. Elec. Auth., 432 So.2d 470, 480 (Aa.1983)); see also Ex parte Greater Mobile-Washington County Mental Health-Mental Retardation Bd., Inc., 940 So.2d 990, 997 (Ala.2006) (also quoting Thomas, 432 So.2d at 480).
Tallaseehatchie Creek and Greater Mobile-Washington County Mental Health Board relied on Armory Commission of Alabama v. Staudt, 388 So.2d 991 (Ala. 1980), in which this Court identified three factors that determine whether an action against a body created by legislative enactment is an action against the State for purposes of the doctrine of State immunity:
“Whether a lawsuit against a body created by legislative enactment is a suit against the state depends on [1] the character of power delegated to the body, [2] the relation of the body to the *403 state, and [S] the nature of the function performed by the body. All factors in the relationship must be examined to determine whether the suit is against an arm of the state or merely against a franchisee licensed for some beneficial purpose.”
388 So.2d at 993 (emphasis added).
In Ex parte Department of Human Resources, 999 So.2d 891, 897 (Ala.2008), this Court stated “that the same factors (‘the Staudt factors’) are informative in determining whether an entity established by a State agency, at the direction of the legislature is part of that agency for purposes of sovereign immunity.” Likewise, in Vandenberg v. Aramark Educational Services, Inc., 81 So.3d 326, 339 (Ala.2011), this Court explained:
“The immunity that comes from § 14 and that is associated with being part of the State ... does not automatically attach to all public corporations; some public corporations are entitled to it while others are not. In Armory Commission of Alabama v. Staudt, 388 So.2d 991, 993 (Ala.1980), we explained what more is required before a public corporation may claim that immunity....”
When applying the three Staudt factors, this Court “emphasizes substance over form.”[3] Tallaseehatchie Creek, 620 So.2d at 630. As this Court noted in Alabama Girls’ Industrial School v. Reynolds, 143 Ala. 579, 583, 42 So. 114, 115 (1904):
“If the suit instituted against it is practically and really against the State — if the judgment and decree obtained against it must be satisfied, if at all, out of the property held by it, and this property belongs to the State, though the title is eo nomine in the [defendant] as an agent of the State — then clearly to permit an action or suit against it would be doing by indirection that which cannot be done directly. In other words, if the [defendant] is a mere State agency — a representative of the State, instituted and maintained by the sovereignty for the exercise of a governmental function — a suit against it is a suit against the State.... ”
(Emphasis added.)
1. The Character of Power Delegated to, and the Nature of the Function Performed by, the Authority[4]
In adopting the HCA Act, the legislature stated:
“[P]ublicly-owned (as distinguished from investor-owned and community-nonprofit) hospitals and other health care facilities furnish a substantial part of the indigent and reduced-rate care and other health care services furnished to residents of the state by hospitals and other health care facilities generally....”
Ala.Code 1975, § 22-21-312(1). The legislature also concluded that,
“as a result of current significant fiscal and budgetary limitations or restrictions, the state and the various counties, municipalities, and educational institutions therein are no longer able to provide, from taxes and other general fund moneys, all the revenues and funds necessary to operate ... publicly-owned hospitals and other health care facilities adequately and efficiently....”
Ala.Code 1975, § 22-21-312(2). Accordingly, “to enable such publicly-owned hos- *404 pitáis and other health care facilities to continue to operate adequately and efficiently,” the legislature enacted the HCA Act “to provide a corporate structure somewhat more flexible than those ... provided for in existing laws relating to the public hospital and health-care authorities” and to give “the entities and agencies operating [public hospitals and health-care authorities] ... significantly greater powers with respect to health care facilities than now vested in various public hospital or health-care authorities.” Ala.Code 1975, § 22-21-312(8).
Although the powers to arrange for the provision of health-care services to the indigent and to promote public health are legitimate ends of government, they certainly are not functions unique to government. Thus, the power granted authorities under the HCA Act in this regard, and in particular by the Board to the Authority, is not of the same character, for example, as the power granted an entity that is charged with a strictly governmental function, e.g., law enforcement. Compare, e.g., Ex parte Board of Dental Exam’rs of Alabama, 102 So.3d 368 (Ala.2012) (citing and quoting Ala.Code 1975, §§ 34-9-40(a), 34-9-13, 34-9-46, and 34-9-5), with Ala.Code 1975, § 22-21-318. Clearly, the nature of the authority to operate a public hospital is not such as to dictate an affirmative answer to the question whether the entity who holds that authority is entitled to immunity.[5]
*405 Also, a review of the powers that may be granted a health-care authority under the HCA Act reflects, with a few exceptions, powers that legally may be exercised by any number of private or for profit business entities. Compare Ala.Code 1975, § 22-21-318, with, e.g., Ala.Code 1975, § 10-2B-3.02 (general powers of corporations), and Ala.Code 1975, § 10-3A-20 (general powers of nonprofit corporations).
Beyond the general power to operate a public hospital, we note that a health-care authority created under the HCA Act may, if so provided in the authority’s certificate of incorporation, exercise a right of eminent domain, namely,
“the'same power of eminent domain as is vested by law in any authorizing subdivision, in the same manner and under the same conditions as are provided by law for the exercise of the power of eminent domain by such authorizing subdivision; provided however, that under no circumstances may an authority exercise the power of eminent domain for the purposes of providing office facilities for any physician, dentist or other health care professional primarily for use in his private practice.”
See Ala. Code 1975, § 22-21-319. The Authority’s certificate of incorporation provides it with the power of eminent domain. Although that power is among powers that belong to the State, this Court has not found the possession of the power of eminent domain to be determinative, in and of itself, of the issue whether a particular entity is entitled to State immunity. Clearly, the power of eminent domain is a power enjoyed by entities such as municipalities and counties, public corporations, and other agencies that are not part of the State and that do not enjoy State immunity. See, e.g., Greater Mobile-Washington Cnty. Mental Health Board, 940 So.2d at 994; Tallaseehatchie Creek, 620 So.2d at 630; and Thomas v. Alabama Mun. Elec. Auth., 432 So.2d at 481 (see Ala.Code 1975, § 11-50A-8(4)).
The Authority also possesses certain powers under the HCA Act that pose difficulty in reaching a conclusion that the Authority has State immunity. In particular, it is especially hard for this Court to overlook the fact that the legislature, which is responsible for the creation of health-care authorities, expressly contemplated that such authorities would be entities subject to suit:
“(a) In addition to all other powers granted elsewhere in this article, and subject to the express provisions of its certificate of incorporation, an authority shall have the following powers, together with all powers incidental thereto or necessary to the discharge thereof in corporate form:
[[Image here]]
“(2) To sue and be sued in its own name in civil suits and actions, and to défend suits and actions against it, including suits and actions ex delicto and ex contractu, subject, however, to the provisions of Chapter 93 of Title 11, which chapter is hereby made applicable to the authority.”
Ala.Code 1975, § 22-21-318. This language is plain. “Although, such a clause is not determinative of an Authority’s status, it does show the intent of the legislature to create a separate entity rather than an agency or an arm of the state.” Stallings & Sons, Inc. v. Alabama Bldg. Renovation Fin. Auth., 689 So.2d 790, 792 (Ala.1996). See also Wassman v. Mobile Cnty. Commc’ns Dist., 665 So.2d 941, 943 (Ala.1995) (applying Staudt and concluding that the Communications District did not possess State immunity; “the ‘power to sue and to be sued’ language in the empowering statute is incompatible with the constitutional immunity with which state agencies are cloaked”).[6]
*406 In addition, Ala.Code 1975, § 22-21-318(a)(5), provides that a health-care authority has the power
“[t]o acquire, construct, reconstruct, equip, enlarge, expand, alter, repair, improve, maintain, equip, furnish and operate health care facilities at such place or places, within and without the boundaries of its authorizing subdivisions and within and without the state, as it considers necessary or advisable....”
(Emphasis added.) If a health-care authority created under the HCA Act is a State agency, the legislature, by this provision, has authorized a State agency to own a health-care facility located in another state, a state in which the Authority would not possess State immunity like it has in Alabama. Under such a scenario the legislature would have, in effect, preferred the claims of injured patients who are citizens of other states to those of Alabama citizens.
Finally, any discussion of the first Staudt factor — “the character of power delegated to the body” — in the present case must consider the control retained by Baptist Health in relation to the operation of the Authority and the reservation by Baptist Health of an interest in the Authority’s assets. As to the former, the affiliation agreement, which is incorporated by reference in the Authority’s certificate of incorporation, reserves to Baptist Health the right to approve certain significant transactions and operational changes.[7]
Additionally, § 1.3 of the affiliation agreement provides for Baptist Health to transfer to the Authority all its assets and all interest in any subsidiaries or other affiliates; the affiliation agreement does not appear to require any payment by the Authority in return for those assets and *407 affiliates. Although § 1.4 of the affiliation agreement states that “[e]ffective as of the Closing Date, the Authority will assume all debts, liabilities and other obligations of Baptist Health,” it continues by stating:
“Baptist Health shall not be released from any of such debts, liabilities and other obligations. Neither UABHS nor its sponsors ([University of Alabama Health Services Foundation, P.C.,] and the ... Board) will assume or be required to guarantee any debts, liabilities, or other obligations of Baptist Health or the Authority.”
(Emphasis added.)
The affiliation agreement further provides in § 3.3 that, upon the termination of the affiliation agreement, the Authority is to transfer its assets back to Baptist Health, either entirely or in substantial part.[8] Termination of the affiliation agreement for this purpose includes termination by Baptist Health or any other party, either with or without cause. As to termination by Baptist Health, § 3.4 of the affiliation agreement provides that “cause” includes
“(i) the conduct of affiliation activities or the business of the Authority in a manner contrary to the mission of Baptist Health; (ii) the benefits of the Authority structure are eliminated; or (iii) breach by the [Board and UABHS] of the material terms of this Agreement and the continuation of such breach for 60 days after written notice of such breach is delivered to the [Board and UABHS] by Baptist Health.”
2. The Relation of the Authority to the State'
According to the Authority’s brief, “the legislature has determined that the Authority ‘acts as an agency or instrumentality of its authorizing subdivisions and as a political subdivision of the state.’ Ala. Code [1975,] § 22-21~318(c).” Thus, the Authority contends, it shares the immunity of its “authorizing subdivision,” the Board. See Cox v. Board of Trs. of Univ. of Alabama, 161 Ala. 639, 648, 49 So. 814, 817 (1909) (University’s board of trustees “are but agents appointed by the state to manage the affairs of the University,” which possesses immunity under § 14).
The specific context of the above-quoted language from Ala.Code 1975, § 22-21-318(c), however, is as follows:
“(c) As a basis for the power granted in subdivision (31) of the preceding subsection (a), the Legislature hereby:
“(1) Recognizes and contemplates that the nature and scope of the powers conferred on authorities hereunder are such as may compel each authority, in the course of exercising its other powers or by virtue of such exercise of such powers, to engage in activities that may be characterized as ‘anticompetitive’ within the contemplation of the antitrust laws of the state or of the United States; and
“(2) Determines, as an expression of the public policy of the state with respect to the displacement of competition in the field of health care, that each authority, when exercising its powers hereunder with respect to the operation and management of health *408 care facilities, acts as an agency or instrumentality of its authorizing subdivisions and as a political subdivision of the state.”
(Emphasis added.) Section 22-21-318(a)(31), Ala.Code 1975, provides that a health-care authority created under the HCA Act can
“exercise all powers granted hereunder in such manner as it may determine to be consistent with the purposes of this article, notwithstanding that as a consequence of such exercise of such powers it engages in activities that may be deemed ‘anticompetitive’ within the contemplation of the antitrust laws of the state or of the United States.”
Based on the foregoing, it is apparent that the legislature has stated that a health-care authority acts as an agency or instrumentality of its authorizing subdivision and as a political subdivision of the State only in connection with its engagement in anticompetitive conduct. What the Authority’s argument glosses over is that the issues of immunity from antitrust laws and of State immunity are two different things. The former is a legislatively controlled immunity related to a particular activity; the latter is a blanket immunity provided by the Alabama Constitution of 1901. An entity may be authorized by the State to engage in anticompetitive activity and be immune from suit for doing so but still not possess State immunity. This is evident from considering the antitrust precedents themselves.
To the extent the Authority argues that the legislature’s articulation of a policy that it should have antitrust immunity is an “indication” that supports the conclusion that it should be viewed as the State for purposes of § 14 immunity, it is a very weak “indication.” It is well settled that even “local governmental entities” may “ ‘engage[ ] in anticompetitive conduct pursuant to a ‘clearly expressed state policy.’ ” Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1460 (11th Cir.1991) (quoting Town of Hallie v. City of Eau Claire, 471 U.S. 34, 40, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985)) (emphasis added). As the United States Supreme Court has stated:
“Municipalities ... are not beyond the reach of the antitrust laws by virtue of their status because they are not themselves sovereign. Rather, to obtain exemption, municipalities must demonstrate that their anticompetitive activities were authorized by the State ‘pursuant to state policy to displace competition with regulation or monopoly public service.’ ”
Town of Hallie, 471 U.S. at 38-39, 105 S.Ct. 1713 (citations omitted); see also Mobile Cnty. Water, Sewer & Fire Prot. Auth., Inc. v. Mobile Area Water & Sewer Sys., Inc., 567 F.Supp.2d 1342, 1349 (S.D.Ala.2008) (noting that immunity from prosecution under federal antitrust law “is not confined to states, but has been extended to municipalities and instrumentalities of states, albeit under a different legal test.... ‘[P]olitical subdivisions such as municipalities are immune from antitrust liability if their anticompetitive acts follow a clearly articulated and affirmatively expressed state policy.’ ” (quoting Bankers Ins. Co. v. Florida Residential Prop. & Cas. Joint Underwriting Ass’n, 137 F.3d 1293, 1296 (11th Cir.1998))). Even a private entity may engage in certain anticom-petitive conduct when the restraint on trade is “ ‘clearly articulated and affirmatively expressed as state policy’ ” and “the policy [is] ‘actively supervised’ by the State itself.” California Retail Liquor Dealers Ass’n v. Midcal Aluminum, Inc., 445 U.S. 97, 105, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980).
Despite the potential availability to them of immunity as to certain anticompet-itive conduct, however, neither counties nor municipalities nor private entities are *409 part of the State or enjoy State immunity. See, e.g., Parker v. Jefferson Cnty., 796 So.2d 1071, 1072 n. 2 (Ala.2000); Knight v. West Alabama Envtl. Imp. Auth., 287 Ala. 15, 20, 246 So.2d 903, 906 (1971); Ex parte Tuscaloosa Cnty., 796 So.2d 1100, 1103 (Ala.2000); and Ex parte Hale Cnty. Bd. of Educ., 14 So.3d 844 (Ala.2009).[9]
Pursuant to Ala.Code 1975, § 22-21-318(a)(7), a health-care authority created under the HCA Act has the power to sell and otherwise to dispose of personal and real property without the permission of the “authorizing subdivision” that sponsored its formation. The only caveat prescribed by § 22-21-318(a)(7) is that the healthcare authority may not exercise this power in a manner that would materially impair its ability to provide the health-care services for which it was created.
Further, the legislature has provided that certain laws that normally apply to the State or its agencies are not to be applied to a health-care authority created under the HCA Act. See Tennessee Valley Printing Co. v. Health Care Auth. of Lauderdale Cnty., 61 So.3d 1027, 1033 (Ala.2010) (noting that “health-care authorities are exempt from certain laws applicable to governmental entities”). Thus, unlike certain entities that have been held to possess State immunity, a health-care authority created under the HCA Act is not subject to State ethics laws. Compare Ex parte Board of Dental Exam’rs, 102 So.3d at 376 (“ ‘The board [of dental examiners] ... shall adhere to guidelines and proceedings of the State Ethics Commission as provided in Chapter 25 of Title 36.’ ” (quoting Ala.Code 1975, § 34-9-43(b))), with Ala.Code 1975, § 22-21-334 (“The provisions of Chapter 25 of Title 36 shall ... not apply to any authority, the members of its board or any of its officers or employees.” [10]). Likewise, the legislature provided that the board of directors’ meetings of a health-care authority formed pursuant to the HCA Act are not subject to the provisions of the Alabama Open Meetings Act, Ala.Code 1975, § 36-25A-1 et seq. See Ala.Code 1975, § 22-21-316(c).[11] Further, *410 the legislature provided that the competitive-bid laws set forth in Ala.Code 1975, § 41-16-20 through § 41-16-63, which are applicable to public contracts, do not apply to a health-care authority created under the HCA Act. See Ala.Code 1975, § 22-21-385; Rodgers v. Hopper, 768 So.2d 963 (Ala.2000) (holding that leases entered into by the Alabama Corrections Institute Finance Authority, which was held not to have State immunity, are exempt from the competitive-bid law, see Ala.Code 1975, § 14-2-36); Thomas, supra (holding that contracts of the Alabama Municipal Electric Authority, which was held not to have State immunity, are not subject to the public-contract statutes, see Ala.Code 1975, § 41-16-1 et seq., which include the competitive-bid statutes, see Ala.Code 1975, § 11-50A-29).
In regard to other provisions of the HCA Act, we note that the legislature provided limited guidance as to who may serve as members of the board of directors of a health-care authority. Section 22-21-316(a) provides that “no fewer than a majority of the directors shall be elected by the governing body or bodies of one or more of the authorizing subdivisions.”[12] Provisions regarding the composition of a board of directors have not precluded us from determining that an entity was not entitled to State immunity. See Stallings & Sons, 689 So.2d at 793 (“We have found no precedent holding that membership on an authority’s board of directors of the governor, the finance director, the state treasurer, or, for that matter, any state officer is determinative of whether an authority is an entity that could be sued or one that is immune from suit.”); see also Thomas, supra, and the relevant statutory provision governing the Alabama Municipal Electric Authority, Ala.Code 1975, § 11-50A-6. Also, we note that the HCA Act does not require that any director be employed by or otherwise associated with the governing body of the authorizing subdivision. Thus, the legislature did not require that the board of directors of a health-care authority be composed entirely of individuals, or indeed of any individuals, who are subject to the daily control of the authorizing subdivision that created it.[13]
Significantly, there is no indication that the Authority receives appropriations from the State or from the Board. Compare Sarradett v. University of South Alabama Med. Ctr., 484 So.2d 426, 427 (Ala.1986) (“[Counterclaim defendant] has cited us to numerous acts of the legislature appropriating money to the University of South Alabama for operation of the medical center [it owned and operated]. Therefore, and notwithstanding the ad valorem tax and any other sources of income for [counterclaim defendant], it appears to us that a judgment against [counterclaim defendant] in this case would directly affect the financial status of the State treasury.”); Staudt, 388 So.2d at 993 (“Substantial appropriations for the Armory Commission are made through the Military Department and are payable from funds in the state treasury to the credit of the Armory Commission. See, e.g., 1979 Ala. Acts, No. 79- *411 124, p. 192. Additionally, the governor is authorized to use any appropriation for military purposes to pay expenses or obligations of the Commission. Code 1975, § 31-4-6.”). In addition to the significance of this factor in its own right, it supports the conclusion that a judgment against the Authority would not directly affect the State treasury.
A health-care authority created under the HCA Act has no authority or power to levy any taxes. Ala.Code 1975, § 22-21-318(d). Nor has the legislature provided that the State, or the Board, must make any provision for a health-care authority out of tax revenues (except under circumstances that are not before us, see Ala. Code 1975, § 22-21-330). See Ala.Code 1975, § 22-21-344 (“Nothing in this article shall be construed to permit the use, by or for the benefit of any authority, of the proceeds of any hospital tax for any purpose, at any place, or in connection with any health care facilities, not permitted or described in the constitutional, statutory or other provision of law authorizing the imposition, levy and collection of such hospital tax or the use of the proceeds therefrom.”). We also note that the legislature has not required that a health-care authority deliver any specific level of medical services to the public, particularly to the indigent.
A health-care authority created pursuant to the HCA Act is a tax-exempt entity. See Ala.Code 1975, § 22-21-333. -Although this Court has recognized that an entity’s exemption from state and local taxation might suggest that the entity is an agency of the State, we have not found that factor determinative for purposes of our State-immunity analysis. See, e.g., Greater Mobile-Washington Cnty. Mental Health Bd., 940 So.2d at 994; Tallaseehatchie Creek, 620 So.2d at 630.[14]
As previously referenced, and as is discussed in more detail below, we note that, subject to compensation to be paid to UABHS under limited circumstances of an amount equal to only a portion of those assets, the Authority must return all the assets of the Authority, including any transferred to it by Baptist Health, to Baptist Health upon the termination of the affiliation agreement. The same return of assets to Baptist Health is contemplated in the event of a dissolution of the Authority. In 'the latter regard, although the certificate of incorporation provides for the transfer of assets to the Board in the event of a dissolution of the Authority, it also specifically states that this transfer is “subject to the Authority’s obligations under the Affiliation Agreement with respect to reconveyance of assets upon termination of the Affiliation Agreement.” As previously noted, section 3.4 of the affiliation agreement includes, among other “for cause” reasons for termination of the agreement by Baptist Health, the following:
“(i) the conduct of affiliation activities or the business of the Authority in a manner contrary to the mission of Baptist Health; (ii) the benefits of the Authority structure are eliminated; or (iii) breach by the [Board and UABHS] of the material terms of this Agreement and the continuation of such breach for 60 days after written notice of such breach is delivered to the [Board and UABHS] by Baptist Health.”[15]
*412 During oral argument, the Authority correctly noted that, although it was required to make a contribution to UABHS each year in an amount generally equal to 25% of the Authority’s net operating income, no part of its net earnings could be distributed as such to Baptist Health. Section 22-21-337, Ala.Code 1975, provides:
“An authority shall be a public corporation or authority and no part of its net earnings remaining after payment of its expenses shall inure to the benefit of any individual, firm or corporation, except in the event the board shall determine that sufficient provision has been made for the full payment of the expenses, securities and other obligations of the authority, then any portion, as determined by the board, of the net earnings of the authority thereafter accruing may, in the discretion of the board, be paid to one or more of its authorizing subdivisions.”
Nonetheless, because all or a substantial part of the assets held by the Authority at the time of the termination of the affiliation agreement are to be transferred to Baptist Health, to the extent that the operation of the health-care facility results in any growth in the value of the assets during the term of the affiliation agreement, that growth will inure to the benefit of Baptist Health upon the termination of the affiliation agreement.[16]
*413 In addition, we note that, unlike certain entities that have been held to possess State immunity, a health-care authority created under the HCA Act is not required to file with the State an audit or report of the authority’s income and expenditures. Compare Ex parte Board of Dental Exam’rs, 102 So.3d at 383 (citing Ala.Code 1975, § 34-9-42). Likewise, the legislature has not restricted a health-care authority created under the HCA Act to hiring only attorneys who are approved by the attorney general. Compare id. (citing Ala.Code 1975, § 34-9-43(a)(8)b.), with Ala.Code 1975, § 22-21-318(a)(25).
Significantly, although a health-care authority created under the HCA Act may issue bonds and incur indebtedness, the legislature specifically has provided that a health-care authority’s debts and obligations are not debts and obligations of the State or of an authorizing subdivision. Section 22-21-325, Ala.Code 1975, states:
“All agreements and obligations undertaken, and all securities issued, by an authority shall be solely and exclusively an obligation of the authority and shall not create an obligation or debt of the state, any authorizing subdivision or any other county or municipality within the meaning of any constitutional or statutory provision. The faith and credit of the state, any authorizing subdivision or any other county or municipality shall never be pledged for the payment of any securities issued by an authority; nor shall the state, any authorizing subdivision or any other county or municipality be liable in any manner for the payment of the principal of or interest on any securities of an authority or for the perform-anee of any pledge, mortgage, obligation or agreement of any kind whatsoever that may be undertaken by an authority.”
Compare Ex parte Board of Dental Exam’rs, supra, with Ala.Code 1975, §§ 22-21-318(a)(9) and 22-21-325. See also Rodgers, supra (citing Ala.Code 1975, § 14-2-24, which states: “No obligation incurred by the [Alabama Corrections Institute Finance Authority] ... shall create an obligation or debt of the state.”); Tallaseehatchie Creek, 620 So.2d at 630 (obligations of Watershed Conservancy District are not obligations of the State, county, or municipality, see Ala.Code 1975, § 9-8-61(3)); Stallings & Sons, 689 So.2d at 792 (“Stallings argues that, in light of the inclusion of this language in the enabling legislation, the Authority, if it is an arm of the state, cannot perform its necessary functions without violating § 213, Ala. Const.1901, which provides that ‘any act creating or incurring any new debt against the state, except as herein provided for, shall be absolutely void.’ We agree.” (footnote omitted)); and Thomas, 432 So.2d at 481 (“[T]he Authority exists as a public corporation separate and apart from the State. Any liabilities the Authority might incur would never be payable out of the State Treasury.”).
3. Weighing the Staudt Factors Against Each Other
In Rodgers, supra, this Court concluded that the Alabama Corrections Institute Finance Authority (“the ACIFA”), a public corporation formed pursuant to Ala.Code 1975, § 14-2-1 et seq., was not entitled to *414 immunity under § 14, Ala. Const.1901. Discussing Tallaseehatchie Creek, the Rodgers Court stated:
“As a [watershed conservancy district (‘WCD’)], [Tallaseehatchie] Creek was authorized to act as an agent of the State. It enjoyed the customary governmental power of eminent domain; it was exempt from State and local taxation; and it benefited from legislative appropriations. See §§ 9-8-61(1), 9-8-61(7), and 9-8-67. Despite these decidedly governmental characteristics, we held that Tallaseehatchie Creek, as a WCD, was an independent entity, arid, thus, was not entitled to sovereign immunity. Tallaseehatchie Creek, 620 So.2d at 681.
“This Court based its holding in that case on several key characteristics that distinguished WCDs as entities separate from the State. Those characteristics included the ability to: (1) sue and be sued; (2) enter into contracts; (3) sell and dispose of property; and (4) issue bonds. Id. at 630 (citing [Ala.Code 1975,] §§ 9-8-25(a)(13), 9-8-61(6), and 9-8-61(4) and (5)). Notably,.the Legislature also had expressly provided that debts and obligations of a WCD were not the State’s debts and obligations. Id. (citing [Ala.Code 1975,] § 9-8-61(3)). We found this final characteristic to be dispositive, stating:
“‘This last provision clearly contemplates that WCD are entities separate and apart from the State; the provision also introduces an element of ambiguity into the crucial question of the financial responsibility for any judgment adverse to a WCD.’
“Tallaseehatchie Creek, 620 So.2d at 630.
“In the present case, ACIFA has these same qualities, qualities suggesting that it is an entity independent of the State. These qualities include: (1) the power to sue and be sued; (2) the power to enter into contracts; (3) the power to sell and dispose of property; (4) the power to issue bonds; and (5) exclusive responsibility for its financial obligations (the same quality that we found dispositive in Tallaseehatchie Creek). See [Ala.Code 1975,] §§ 14-2-8(2), 14-2-8(5) through (7), 14-2-12, and 14-2-24.
“ACIFA argues that, notwithstanding that it has those qualities, it is organizationally intertwined with the State by virtue of the State’s oversight power regarding ACIFA’s chief operating activity — prison construction. This oversight power, however, is not different from the power to direct operations that is commonly exercised by the owner of any ordinary business. In this case, the State’s power to direct operations includes the power to approve prison-construction plans and the use of prison labor. ACIFA’s relationship with the State does not persuade us to accept its argument.”
768 So.2d at 967.
Consistent with the approach taken by the Court in Rodgers and Tallaseehatchie Creek, we take stock of some of the more noteworthy factors weighing for and against treatmerit of the Authority as an arm of the State.' Those that support that treatment include: (1) its purposes of promoting public health and arranging for the provision of health-care services to the indigent, (2) the ability to exercise the right of eminent domain in furtherance of its corporate purposes, (3) the articulation by the legislature of a policy choice that the Authority be permitted to engage in anti-competitive conduct, (4) the Authority’s tax-exempt status, and (5) the appointment of a majority of the directors of the Authority by the Board. Among the factors that support the treatment of a health-care authority formed under the HCA Act as simply a franchisee of the State are: (1) *415 the fact that operating a hospital is not a uniquely governmental function, (2) the power to sell and dispose of property, (3) the fact that the State assumes no responsibility for any debt issued by a healthcare authority, (4) the fact that no tax dollars are used in the operation of a health-care authority, (5) the power of a health-care authority to make contracts and to do so without being required to solicit bids or to participate in the State contract-review process, (6) the fact that the legislature specifically prescribed to health-care authorities an amenability to suit, and, perhaps most significantly, (7) the fact that money judgments and other losses or obligations incurred by a healthcare authority are not payable from the State treasury and therefore do not “directly affect the financial status of the State treasury.”
After examining and weighing the significance of these factors, we conclude that the factors that support treatment of the Authority as a franchisee of the State rather than as an “arm of the State” predominate. The impact of many of the factors supporting treatment as the State is diluted in some manner as discussed in the analysis above. Among other things, the power to operate a public hospital, including providing indigent health care, the power to exercise eminent domain, the legislature’s expression of intent that the Authority be permitted to engage in anticom-petitive conduct, and the Authority’s tax-exempt status are all powers or privileges that may be held by entities such as cities, counties, public corporations, and/or. nonprofit corporations that are not entitled to State immunity. Furthermore, we consider the import of these factors to be well outweighed by the same five factors found to be dispositive in Tallaseehatchie Creek and Rodgers, i.e., the power to sell and dispose of property, the legislature’s prescription to the Authority of amenability to suit, the power to make contracts without being subject to the State’s competitive-bid laws or the contract-review process, the power to issue debt for which the State assumes no responsibility, and, most significantly, the fact that any judgments or other losses incurred by the Authority are not payable from the State treasury. In addition, a health-care authority has no power to levy any taxes, and, except in certain limited circumstances, no taxes are used to maintain or operate a health-care authority.. Finally, in the present case there is the additional fact that Baptist Health has retained control of certain significant operational decisions and has reserved an interest in the assets of the Authority.
4. Conclusion as to State Immunity
The function performed by the Authority is, in the main, providing the same health services as were provided, prior to the formation of the Authority, by a private entity. Moreover, the intrinsic character of a health-care authority formed under the HCA Act is distinguishable from that of the health-care-service providers that have been held to possess State immunity. Compare, e.g., Liberty Nat’l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So.2d 1013 (Ala.2003); Sarradett, supra; and Hutchinson v. Board of Trs. of Univ. of Alabama, 288 Ala. 20, 256 So.2d 281 (1971). See also White v. Alabama Insane Hosp., 138 Ala. 479, 35 So. 454 (1903) (involving a hospital for the “insane” and noting, among other things, that the State supplied the means by which the hospital was maintained and operated).
Based on our weighing of the Staudt factors, we must conclude that a healthcare authority organized and operating under the HCA Act is not an “ ‘immediate and strictly governmental agenc[y] of the State.’” See, e.g. Tallaseehatchie Creek, *416 620 So.2d at 631 (quoting Thomas, 432 So.2d at 480). The Authority does not serve as “an arm of the State.” Instead, it is a “franchisee licensed for some beneficial purpose,” Staudt, 388 So.2d at 993, namely to participate with other healthcare providers in this State, both public and private, in rendering health-care services to citizens of this State. The Authority therefore is not entitled to State immunity under § 14 of the Alabama Constitution.

B. Damages Cap of § 11-93-2

We turn now to the applicability of the $100,000 damages cap in § 11-93-2.
As already discussed, § 22-21-318(a)(2) of the HCA Act provides that health-care authorities shall be amenable to suit in both tort and contract actions. It continues, however, by stating that this amenability to suit is “subject ... to the provisions of Chapter 93 of Title 11, which chapter is hereby made applicable to the authority.” (Emphasis added.)
The Authority argues that this latter language, or at least the “hereby made applicable” language, evidences an intent by the legislature to make the $100,000 damages cap that is applicable to county and municipal agencies and instrumentalities under Chapter 93 applicable to all health-care authorities formed under the HCA Act, regardless of whether the Authority constitutes an agency or instrumentality of a county or municipality.
Consistent with the position taken by the trial court, Davis responds by arguing that the above-emphasized portions of §.22-21-318(a)(2) plainly provide for the application of the “chapter” — i.e., the entire “chapter” and all “the provisions” found therein. Davis points out that among “the provisions” of Chapter 93 “hereby made applicable” are the provisions in Ala.Code 1975, § 11-93-2 and § 11-93-1(1), defining the partial immunity granted by Chapter 93 as a partial immunity for counties and municipalities and their agencies.[17]
Davis notes that in § 22-21-318(a)(2) the legislature did not simply borrow by reference the 'monetary amount of the damages cap prescribed in § 11-93-2 for counties and municipalities and then create a damages cap for all health-care authorities in this same amount. Instead, Davis argues, it reaffirmed the applicability of Chapter 93, such as it is, to health-care authorities. Davis reasons that the effect of the above-quoted passage is simply to make clear that, despite the fact that § 22-21-318(a)(2) was enacted after Chapter 93 of Title 11, the express grant in the first sentence therein to health-care authorities of the power to “be sued” in the later enacted § 22-21-318(a)(2) is not to be construed as overriding the grant of partial immunity in § 11-93-2 to an “authority” that would otherwise fall within “the provisions” of Chapter 93.
Alternatively, Davis argues that the particular attributes of the Authority in this *417 case, as embodied in its certifícate of incorporation and in the affiliation agreement, prevent the Authority from qualifying as a health-care authority under the HCA Act, or at least would deprive it of the partial immunity, if any, otherwise granted under § 22 — 21—318(a)(2).
We pretermit discussion of the foregoing arguments in light of our conclusion as to the merits of one additional argument made by Davis, namely, that, to the extent the HCA Act was intended to extend the $100,000 damages cap of § 11-93-2 to all health-care authorities organized under the HCA Act, i.e., not just those that constitute agencies or instrumentalities of a county or municipality, it is unconstitutional.
Under Alabama law, there are only two categories of governmental immunity within which the Authority possibly could fall, and the Authority falls within neither.
The first category of immunity extends to the State, which enjoys sovereign immunity. As discussed in Part H.A., the Authority is not an “arm of the State” and does not qualify for State immunity.[18]
The second category applies to local governmental entities, i.e., counties and municipalities. As discussed below, unlike State immunity, this second category finds no expression in the Alabama Constitution; it exists in some measure today only because of the unique, historical treatment afforded counties and municipalities under Alabama law: common-law immunity predating and surviving the adoption of the 1901 Constitution.
As reflected in our cases, the common-law immunity for counties and municipalities, and presumably their agencies, is indeed unique because (a) it was not created by the 1901 Constitution but (b) it did survive the adoption of the 1901 Constitution. The fact that this immunity was a function of common law and not the constitution means that it can and has been restricted or modified by legislative enactments (see, e.g., § 11-47-190, Ala.Code 1975, and Title 11, Chapter 93, Ala.Code 1975, and their predecessors) without violating any constitutional provision restricting the power of the legislature (e.g., § 14, Ala. Const.1901). Conversely, the fact that this common-law immunity was not abrogated by the 1901 Constitution itself means that the continued existence of this immunity in some measure today (i.e., to the extent the legislature has chosen in provisions like § 11^7-190 and § 11-93-2, to allow it) does not offend the 1901 Constitution and its assurances under §§ 11 and 13, Ala. Const.1901, of trial by jury and remedies for injuries. To the contrary, the reach of these provisions has been assessed in the context of the county and municipal immunity that was accepted at the time of their adoption.
It is because of the unique source and nature of county and municipal immunity, and the resulting ability of the legislature thus to limit or modify it, that a statute such as § 11-93-2 can, on the one hand, acknowledge and reaffirm this immunity in some measure and yet simultaneously impose a restriction on that immunity, something the legislature has no power to do with respect to State immunity.[19] The Au *418 thority, however, is not a county or municipality, or an agency thereof. This, taken in combination with the fact that it is not the State, means there is no basis upon which the legislature could extend local governmental immunity to it.[20]
In Home Indemnity Co. v. Anders, 459 So.2d 836 (Ala.1984), this Court rejected a constitutional challenge to § 11-93-2 based on § 13 of the 1901 Constitution (providing for a remedy for every injury). Importantly, in doing so, we specifically acknowledged that counties and municipalities enjoyed an “immunity recognized at common law,” i.e., an immunity that predated the adoption of the Alabama Constitution of 1901. 459 So.2d at 840. On the basis of this “background” this Court upheld the partial immunity afforded by § 11-93-2 as one subject to regulation by the legislature. 459 So.2d at 840-41.
Similarly, in Garner v. Covington County, 624 So.2d 1346 (Ala.1993), this Court rejected the argument that § 11-93-2 violates § 11 of the 1901 Constitution (providing for a right to trial by jury). We began by noting that, in Anders, the Court had rejected the argument “that § 11-93-2 ‘violates the remedy provisions of Article I, § 13.’” 624 So.2d at 1351. Consistent’ with Anders, we explained that § 11-93-2 “must be addressed in the context of the unique status of counties and cities as governmental entities.” Id. We explained that, because of the unique role of counties and municipalities as local governmental entities, actions against counties and municipalities “have always been subject to reasonable regulation by the legislature on a basis not applicable to actions against individuals and other entities.” Id. In Garner, we specifically discussed the rejection at the 1901 Constitutional Convention of a provision that would have provided for the right to sue a municipality and quoted portions of the Convention’s debate indicating that, in rejecting the provision, the members understood that, in its absence, counties and municipalities would continue to enjoy an immunity from suit, albeit one subject to “regulation” by the legislature. 624 So.2d at 1351-54. We ended our analysis as follows:
“Because cities and counties are exercising governmental functions, however, and because judgments against them must be paid out of public moneys derived from taxation, the reasonable limitation of § 11-93-2 on awards against them must be sustained. If the Constitutional Convention had adopted the proposed limitation on the legislative power to regulate actions against municipalities, we would probably reach a different result. Given this constitutional history, however, we cannot say that § 11-93-2 violates the constitution.”.
Id. at 1354-55.
In Smith v. Schulte, 671 So.2d 1334 (Ala.1995), this Court specifically explained that § 11, Ala. Const.1901, must be read in the context of the causes of action available at common law and that the immunity of counties and municipalities under the common law was the reason limitations on their liability, as reflected in statutes such as § 11-93-2, were constitutional:
“It is well settled in Alabama that § 11 governs (1) those causes of action arising under the common law, and (2) those causes of action afforded by pre- *419 1901 statutes. This principle was never more forcefully stated than in Gilbreath v. Wallace, 292 Ala. 267, 270, 292 So.2d 661, 653 (1974), where the Court declared: ‘Alabama’s Constitution effected a “freezing” of the right to jury trial as of 1901.’ 292 Ala. at 269, 292 So.2d at 652. See also Alford v. State ex rel. Attorney General, 170 Ala. 178, 188-89, 54 So. 213, 215-16 (1910) (Mayfield, J., dissenting); Tims v. State, 26 Ala. 165 (1855).”
671 So.2d at 1342 (emphasis omitted). As we further explained:
“The distinction between the [county and municipal] entities subject to § 11-93-2 and [the medical providers] subject to § 6-5-547[, Ala.Code 1975,] renders these respective statutes so fundamentally distinguishable as to eliminate the need for further elaboration. Suffice it to say, as did the trial judge: ‘The defendants in the case at bar do not enjoy the unique status of counties or cities; and, therefore, no such status, crucial to the rationale of Garner, supports the constitutionality of the § 6-5-547 cap on any wrongful death judgment against medical providers.’ ”
671 So.2d at 1343-44 (emphasis added).
It is with equal certitude that we can and must conclude in the present case that the Authority “do[es] not enjoy the unique status of counties or cities; and, therefore, no such status, crucial to the rationale of Gamer [and Schulte and the constitutionality of the application of § 11-93-2 in those cases], supports the constitutionality of the [§ 11-93-2] cap on any ... judgment against [the Authority].” That is, to the extent § 22-21-318(a)(2) may be construed as an attempt to extend the partial immunity for counties and municipalities recognized in § 11-93-2 to an entity that is neither of those, that attempt is unconstitutional.

III. Conclusion

For the foregoing reasons, we must reject the Authority’s argument that it is entitled to the protection afforded counties and municipalities in § 11-93-2. The only other form of governmental immunity that it can and does seek is the sovereign immunity of the State. State immunity would apply only if the Authority were an “immediate and strictly governmental agency of the State.” It is not. It therefore is not entitled to either form of governmental immunity it requests, and the judgment of the trial court therefore is due to be affirmed.
APPLICATION GRANTED; OPINION OF JANUARY 14, 2011, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
PARKER, MAIN, and WISE, JJ., concur.
BRYAN, J., concurs in part and concurs in the result in part.
MOORE, C.J., concurs in the result.
STUART, BOLIN, and SHAW, JJ., dissent. ⅛

. In her initial complaint, Davis used an incorrect name for the Authority. She corrected the name in an amended complaint.
Also, each of the two physicians filed a motion for a summary judgment. The trial court granted both motions. Davis has not filed a cross-appeal as to the judgment in favor of the two physicians.

. In Cox v. Board of Trustees of University of Alabama, 161 Ala. 639, 648, 49 So. 814, 817 (1909), this Court held that for purposes of § 14, Ala. Const.1901, the University of Alabama "is a part of the [S]tate.”

. Accordingly, after examining the Staudt factors, the Court in Greater Mobile-Washington County Mental Health Board concluded that the public corporation at issue there was not an "immediate and strictly governmental agency of the State," 940 So.2d at 997, and therefore was not entitled to immunity. The Court reached the same conclusion as to the agency claiming immunity in the Tallaseehat-chie Creek case.

. Given the similarity and overlap of these two Staudt factors, the following discussion serves to address both of them.

. In a number of cases this Court has held that a State university is entitled to immunity in relation to a public hospital that is part of a college of medicine within the university. The hospitals in those cases, however, were owned and operated directly by the universities as part of their operations. See, e.g., Sarradett v. University of South Alabama Med. Ctr., 484 So.2d 426, 427 (Ala.1986) (holding that sovereign immunity protected an existing public hospital that was acquired by the University of South Alabama and thereafter "owned and operated by the University of South Alabama in conjunction with its college of medicine” (emphasis added)). Irrespective of the function in which they were engaged, those universities were "part of the [S]tate.” See, e.g., Cox v. Board of Trs. of Univ. of Alabama, 161 Ala. 639, 648, 49 So. 814, 817 (1909). The hospitals, in turn, were simply a component part of these universities. See, e.g., Liberty Nat'l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So.2d 1013, 1027 (Ala.2003) (quoting with approval the explanation in the complaint that "UAB Hospital is ‘a division (and/or component) of the University of Alabama at Birmingham "); Hutchinson v. Board of Trs. of Univ. of Alabama, 288 Ala. 20, 24, 256 So.2d 281, 284 (1971) (plurality opinion). See also Recital "A" of the affiliation agreement, explaining that "the University of Alabama Hospital in Birmingham, Alabama, [is] an operating division of the University of Alabama at Birmingham.”
Thus, the immunity of the universities in these hospital cases was not determined by the nature of the activity in which they were engaged. The ownership and operation of a public hospital, including those run for the benefit of the indigent and to promote public health, are by no means functions unique to government. Compare University of Alabama Health Servs. Found., 881 So.2d at 1028 (holding that the University of Alabama at Birmingham Health Services Foundation, "a nonprofit, independent professional corporation that, in part, attends to the billing for UAB Hospital,” and UABHS, an Alabama nonprofit corporation, as "entities separate and distinct from UAB Hospital,” were "not ... shown to qualify for” immunity pursuant to § 14); Ex parte Cranman, 792 So.2d 392, 406 (Ala.2000) (plurality opinion) (concluding that services rendered by a hospital in the treatment of patients was "too remote from governmental policy” to warrant the provision of immunity to a University employee providing that treatment). Instead, the dis-positive factor in these cases was the character of the universities themselves as "part of the [S]tate”:
" ‘Our cases are clear that the operation of a hospital is a “governmental function,” but even if we should classify the operation of University Hospital as being a "business function,” nevertheless, the State could not be sued.' ”
Sarradett, 484 So.2d at 427 (quoting Hutchinson, 288 Ala. at 24, 256 So.2d at 284).

. Also, a health-care authority has the power under the HCA Act
*406 “[t]o assume any obligations of any entity that conveys and transfers to the authority any health care facilities or other property, or interest therein, provided that such obligations appertain to the health care facilities, property or interest so conveyed and transferred .to the authority.”
Ala.Code 1975, § 22-21-318(a)(23). This provision is at least consistent with the notion that an obligation owed a tort creditor who has filed a judgment lien against property that is transferred to an authority is to be enforceable against the authority.

. Section 1.2 of the affiliation agreement states:
"(a) The Authority may not engage in any Restricted Transaction without the prior written consent of ... [the] Board and Baptist Health.
“(b) Each of the following shall be deemed to be a ‘Restricted Transaction':
“(i) any capital expenditure in excess of $10,000,000, either with respect to a single project or in the aggregate with respect to a related group of projects;
"(ii) elimination of any services that, as of the Closing, are provided at the Baptist System Hospitals;
"(ill) any transaction involving the transfer, sale or other disposition of assets of the Authority to any person or entity (including without limitation [the Board and UABHS] or an affiliate of [the Board and UABHS]) other than in the ordinary course of business or as otherwise expressly permitted by this Agreement;
"(iv) the incurring of new debt in excess of $10,000,000, either in a single transaction or in the aggregate with respect to a related series of transactions;
"(v) the appointment or removal of the chief executive officer of the Authority;
"(vi) the amendment of the mission statement for the Authority, as set forth in this Agreement;
"(vii) any amendment to the certificate of incorporation or bylaws of the Authority; and
“(viii) any transfer of funds from the Authority to [the Board and UABHS] or an affiliate of [the Board and UABHS] through contribution, grant, dividend or otherwise, except such transfers as are specifically authorized by this Agreement or transactions in the ordinary course of business of the Authority."
(Emphasis added.)

. If Baptist Health terminates the affiliation agreement other than for cause, § 3.4 provides that Baptist Health must pay as "compensation” to UABHS an amount equal to a percentage of between 33% and 50% of any increase in the value of those assets during the term of the affiliation agreement, plus an additional amount in the event Baptist Health were to then sell or otherwise dispose of those assets within three years of the termination of the affiliation agreement.

. It is unnecessary to cite authority for the proposition that a private entity does not possess State immunity.

. Section 36-25-1(16), Ala.Code 1975, defines "governmental corporations and authorities” as
"[plublic or private corporations and authorities, including but not limited to, hospitals or other health care corporations, established pursuant to state law by state, county or municipal governments for the purpose of carrying out a specific governmental function. Notwithstanding the foregoing, all employees, including contract employees, of hospitals or other health care corporations and authorities are exempt from the provisions of this chapter.”

. The Open Meetings Act provides:
"It is the policy of this state that the deliberative process of governmental bodies shall be open to the public during meetings as defined in Section 36-25A-2(6). Except for executive sessions permitted in Section 36-25A-7(a) or as otherwise expressly provided by other federal or state statutes, all meetings of a governmental body shall be open to the public and no meetings of a governmental body may be held without providing notice pursuant to the requirements of Section 36-25A-3.”
Ala.Code 1975, § 36-25A-l(a) (emphasis added). Section 36-25A-2(4), Ala.Code 1975, defines "governmental body” as
"[a]ll boards, bodies, and commissions of the executive and legislative departments of the state or its political subdivisions or municipalities which expend or appropriate public funds; all multimember governing bodies of departments, agencies, institutions, and instrumentalities of the executive and legislative departments of the state or its political subdivisions or municipalities, including, without limitation, all corporations and other instrumentalities whose governing boards are comprised of a majority of members who are appointed or elected by the state or its political subdivisions, counties, or municipalities; and all quasi-judicial bodies of the executive and legislative departments of the state and all stand *410 ing, special, or advisory committees or subcommittees of, or appointed by, the body.”
(Emphasis added.)

. In this case, the certificate of incorporation of the Authority does provide, in accordance with the statute, that six directors are to be chosen by the Board. The remaining five directors are to be chosen by Baptist Health.

. The legislature did provide that members of the board of directors of the Authority could be "impeached and removed from office in the same manner and on the same grounds” as certain public officials. Ala.Code 1975, § 22-21-316(d) (citing Ala. Const. 1901, § 175). That, however, is simply one factor in the equation before us.

. Section 22-21-337, Ala.Code 1975, provides that ‘‘[a]n authority shall be a public corporation or authority and no part of its net earnings remaining after payment of its expenses shall inure to the benefit of any individual, firm or corporation.” The restriction as to the inurement of net earnings, however, is also part of what distinguishes a public corporation from a private corporation and is consistent with the fact that a health-care authority created pursuant to the HCA Act is a tax-exempt entity.

. Further, section 1.2(a) pf the affiliation agreement states that ”[t]he Authority may *412 not engage in any Restricted Transaction without the prior written consent of the ... Board and Baptist Health.” Section 1.2(b)(iii) provides that the restricted transactions include "any transaction involving the transfer, sale or other disposition of assets of the Authority to any person or entity (including without limitation the [Board and UABHS] ...) other than in the ordinary course of business or as otherwise expressly permitted by this Agreement.”

. Nor does the fact that the Authority is to make a "contribution” to UABHS in most years, or that a payment representing part of the value of the assets of the Authority may, under limited circumstances, be due to UABHS upon termination of the affiliation agreement, support the extension of § 14 immunity to the Authority. Even in cases in which all the assets of a public corporation must, upon dissolution of the corporation, be transferred back to the State itself, our cases do not consider the diminution in income or assets of the corporation to be an invasion of the State treasury in the sense necessary to deem that corporation a part of the State and trigger § 14 immunity. See Greater Mobile-Washington Cnty. Mental Health Bd., 940 So.2d at 996 (holding that board was not entitled to State immunity even though upon dissolution its assets vested in the Department of Mental Health); see also Rodgers, supra (noting that, upon dissolution, the assets of the Alabama Corrections Institute Finance Authority revert to the State, see Ala.Code 1975, § 14-2-25); Stallings & Sons, 689 So.2d at 793 ("[T]he Authority holds title to the property it is charged with maintaining and, in effect, has rights separate from the state, affecting that property and those rights are subject only to the dissolution of the Authority. The conveyance in Section 41-10-470, Ala.Code 1975, provides that the Authority ‘shall be invested with all rights and title that the State of Alabama had in the property conveyed ... thereby, subject to the right of reverter to the state upon dissolution of the authority.' Moreover, a separate account in the state treasury was created for all proceeds derived from the sale of any bonds issued by the Authority and it is ‘subject to be drawn on by the authority’ for the purposes described therein. § 41-10-468, Ala.Code 1975. Based on the foregoing, we believe that it is clear that the Authority was created as a separate entity, that it is not an arm of the state, and that it is not, therefore, immune from suit under § 14.” (emphasis omitted)); Thomas, supra (involving the Alabama Municipal Electric Authority, whose governing statute, Ala. Code 1975, § 11-50A-1 et seq., provides that, upon dissolution, “all the projects, buildings, properties and other assets then owned by the [AMEA] ” are to "be conveyed to the municipalities at that time represented on the election committee.” Ala.Code 1975, § 11-50A-27.).
Moreover, in this case, the aforementioned payments are payments to be made only to UABHS, not the Board. UABHS is a separate corporation formed by the Board and University of Alabama Health Services Foun *413 dation, P.C. ("UAHSF”) (itself a separate corporation). UABHS is not the Board. As this Court specifically has held, UABHS is not part of the State so as to qualify for immunity under § 14. See note 5, supra (also noting our holding that UAHSF is not part of the State so as to qualify for § 14 immunity). The fact that some amount might be paid to UABHS by the Authority under limited circumstances surrounding the termination of the affiliation agreement or the dissolution of the Authority simply holds no import for whether the Authority itself is part of the State for purposes of § 14 immunity.

. Section 11-93-2 provides, in pertinent part, that ‘‘[t]he recovery of damages .under any judgment against a governmental entity shall be limited to $100,000.00 for bodily injury or death....” Section 11-93-1(1) defines "governmental entity” as follows:
"Governmental entity. Any incorporated municipality, any county, and any department, agency, board, or commission of any municipality or county, municipal or county public corporations, and any such instrumentality or instrumentalities acting jointly. ‘Governmental entity' shall also include county public school boards, municipal public school boards and city-county school boards when such boards do not operate as functions of the State of Alabama. 'Governmental entity' shall also mean county or city hospital boards when such boards are instrumentalities of the municipality or county or organized pursuant to authority from a municipality or county.”

. The immunity of certain State officials and of State employees performing certain governmental functions also is a function of the immunity afforded to the State. See Ex parte Cranman, 792 So.2d 392 (Ala.2000) (plurality opinion); Ex parte Butts, 775 So.2d 173 (Ala.2000).

. That the legislature contemplated that some health-care authorities might qualify under Chapter 93 of Title 11 for a type of immunity that the legislature could restrict or waive is further corroboration of the conclusion reached in Part II.A. that the legislature did not consider health-care authorities to be part of the State for purposes of immunity. Dunn *418 Constr. Co. v. State Bd. of Adjustment, 234 Ala. 372, 376, 175 So. 383, 386 (1937) ("[Section 14] wholly withdraws from the Legislature, or any other state authority, the power to give consent to a suit against the state.”).

. Compare, e.g., Hutchinson, 288 Ala. at 24, 256 So.2d at 283 (noting that the claim in that case was not against an agency of a county and must be assessed as one against an agency of the State for purposes of determining whether the entity is entitled to immunity).